# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP2007 |

| | |
|---|---|
| COMPLETE TITLE: | Catholic Charities Bureau, Inc., Barron County Developmental Services, Inc., Diversified Services, Inc., Black River Industries, Inc. and Headwaters, Inc., |
| |         Petitioners-Respondents-Petitioners, |
| |     v. |
| | State of Wisconsin Labor and Industry Review Commission, |
| |         Respondent-Co-Appellant, |
| | State of Wisconsin Department of Workforce Development, |
| |         Respondent-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 406 Wis. 2d 586, 987 N.W.2d 778
(2023 – published)

| | |
|---|---|
| OPINION FILED: | March 14, 2024 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 11, 2023 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Douglas |
|   JUDGE: | Kelly J. Thimm |

JUSTICES:
ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which DALLET, KAROFSKY, and PROTASIEWICZ, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., joined with respect to ¶¶110-61 and 163-98. HAGEDORN, J., filed a dissenting opinion.
NOT PARTICIPATING:

ATTORNEYS:

    For the petitioners-respondents-petitioners, there were briefs filed by *Kyle H. Torvinen,* and *Torvinen, Jones & Saunders, S.C., Superior; Eric C. Rassbach* (pro hac vice),

*Nicholas R. Reaves* (pro hac vice), *Daniel M. Vitagliano* (pro hac vice), and *The Becket Fund for Religious Liberty, Washington, D.C.* There was an oral argument by *Eric Rassbach*.

For the respondent-appellant and respondent-co-appellant, there was a brief filed by *Christine L. Galinat,* and *Department of Workforce Development, Madison; Jeffrey J. Shampo,* and *Labor and Industry Review Commission, Madison*. There was an oral argument by *Jeffrey J. Shampo*.

An amicus curiae brief was filed by *Daniel R. Suhr,* and *Hughes & Suhr LLC, Chicago, IL; Caleb R. Gerbitz, James M. Sosnoski,* and *Meissner Tierney Fisher & Nichols SC, Milwaukee,* on behalf of Maranatha Baptist University, Maranatha Baptist Academy, Concordia University Wisconsin, the Wisconsin Family Counsel, and the Wisconsin Association of Christian Schools.

An amicus curiae brief was filed by *Robert S. Driscoll,* and *Reinhart Boerner Van Deuren SC, Milwaukee; Stephen M. Judge* (pro hac vice)*, Tiernan Kane* (pro hac vice)*,* and *South Bank Legal, South Bend, IN,* on behalf of Catholic Conferences of Illinois, Iowa, Michigan, and Minnesota.

An amicus curiae brief was filed by *Gene C. Schaerr* (pro hac vice), *James C. Phillips* (pro hac vice), and *Schaerr Jaffee LLP, Washington, D.C.; Matthew M. Fernholz,* and *Cramer, Multhauf & Hammes, LLP, Waukesha,* on behalf of Minnesota-Wisconsin Baptist Convention, Lutheran Church - Missouri Synod, National Association of Evangelicals, American Islamic Congress, The Church of Jesus Christ of Latter-day Saints, General Council on Finance and Administration of the United Methodist Church, The Ethics and Religious Liberty Commission, and Islam and Religious Freedom Action Team.

An amicus curiae brief was filed by *Timothy Feldhausen, Tiffany Woelfel,* and *Amundsen Davis LLC, Green Bay; Sarah M. Harris* (pro hac vice), *Mark S. Storslee* (pro hac vice), *Rohit P. Asirvatham* (pro hac vice), and *Williams & Connolly LLP, Washington, D.C.,* on behalf of Professors Douglas Laycock & Thomas C. Berg.

An amicus curiae brief was filed by *Levi W. Swank, Benjamin Hayes,* and *Goodwin Procter LLP, D.C.; Dina Ljekperic,* and *Goodwin Procter LLP, New York, NY; David W. Simon, Gregory N. Heinen,* and *Foley & Lardner LLP, Milwaukee,* on behalf of International Society for Krishna Consciousness and The Sikh Coalition.

An amicus curiae brief was filed by *Jon P. Axelrod, J. Wesley Webendorfer,* and *DeWitt LLP, Madison; Howard Slugh* (pro hac vice), and *The Jewish Coalition for Religious Liberty, Washington, D.C.,* on behalf of Jewish Coalition for Religious Liberty.

An amicus curiae brief was filed by *Samuel Troxell Grover, Patrick C. Elliott, Madison,* on behalf of Freedom From Religion Foundation.

An amicus curiae brief was filed by *David Earleywine,* and *Wisconsin Catholic Conference, Madison; Bradley G. Hubbard* (pro hac vice), *Elizabeth A. Kiernan* (pro hac vice), *Zachary Faircloth* (pro hac vice), *Jason J. Muehlhoff* (pro hac vice), and *Gibson, Dunn & Crutcher LLP, Dallas, TX,* on behalf of Wisconsin Catholic Conference.

An amicus curiae brief was filed by *Jonathan Judge,* and *ArentFox Schiff LLP, Chicago, IL,* on behalf of Catholic Charities USA.

An amicus curiae brief was filed by *Ryan J. Walsh, John D. Tripoli,* and *Eimer Stahl LLP, Madison,* on behalf of Wisconsin State Legislature.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP2007
(L.C. No. 2019CV324)

STATE OF WISCONSIN : IN SUPREME COURT

Catholic Charities Bureau, Inc., Barron County Developmental Services, Inc., Diversified Services, Inc., Black River Industries, Inc. and Headwaters, Inc.,

      Petitioners-Respondents-Petitioners,

  v.

State of Wisconsin Labor and Industry Review Commission,

      Respondent-Co-Appellant,

State of Wisconsin Department of Workforce Development,

      Respondent-Appellant.

**FILED**

**MAR 14, 2024**

Samuel A. Christensen
Clerk of Supreme Court

---

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which DALLET, KAROFSKY, and PROTASIEWICZ, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., joined with respect to ¶¶110-61 and 163-98. HAGEDORN, J., filed a dissenting opinion.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANN WALSH BRADLEY, J. The petitioners, Catholic Charities Bureau, Inc. (CCB) and four of its sub-entities, seek an exemption from having to pay unemployment tax to cover their employees. They assert that they are exempt from coverage under Wisconsin's Unemployment Compensation Act because they are operated primarily for religious purposes.

¶2 Accordingly, CCB together with the four sub-entities (Barron County Developmental Services, Inc., Diversified Services, Inc., Black River Industries, Inc., and Headwaters, Inc.) seek review of a court of appeals decision reinstating a decision of the Labor and Industry Review Commission (LIRC) concluding that CCB and the four sub-entities were not "operated primarily for religious purposes" and thus not exempt from making contributions to the state unemployment insurance system.[1] The petitioners specifically contend that they are exempt from unemployment insurance contributions pursuant to Wis. Stat. § 108.02(15)(h)2. (2019-20),[2] which exempts from the definition of "employment" covered by the Act those "[i]n the employ of an organization operated primarily for religious purposes and

---

[1] Cath. Charities Bureau, Inc. v. LIRC, 2023 WI App 12, 406 Wis. 2d 586, 987 N.W.2d 778 (reversing the order of the circuit court for Douglas County, Kelly J. Thimm, Judge).

[2] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

operated, supervised, controlled, or principally supported by a church or convention or association of churches."[3]

¶3 They assert that they are "operated primarily for religious purposes" because the Diocese of Superior's motivation is primarily religious, i.e., their charitable works are carried out to operationalize Catholic principles. The petitioners further argue that a contrary interpretation would run afoul of the First Amendment to the United States Constitution and that as a result it also would violate Article I, Section 18 of the Wisconsin Constitution.[4]

¶4 On the other hand, LIRC advances that it is the organization's actual activities, and not its motivations, that are paramount in the analysis. Under this formulation, LIRC contends the petitioners do not fulfill the religious purposes

---

[3] Both parties agree that the first half of the statute is not at issue, that is that CCB is "operated, supervised, controlled, or principally supported by a church or convention or association of churches."

[4] Although CCB and its sub-entities allege a violation of the Wisconsin constitution, they did not develop an argument apart from their assertions under the United States Constitution. They assert in a footnote that if the statute violates the First Amendment, then it must also violate the Wisconsin Constitution. It is true that "[t]he Wisconsin Constitution, with its specific and expansive language, provides much broader protections for religious liberty than the First Amendment." Coulee Cath. Schs. v. LIRC, 2009 WI 88, ¶66, 320 Wis. 2d 275, 768 N.W.2d 868 (citing State v. Miller, 202 Wis. 2d 56, 64, 549 N.W.2d 235 (1996)). However, any argument that Wis. Stat. § 108.02(15)(h)2. violates the state constitution specifically is undeveloped. We generally do not address undeveloped arguments, and we will not do so here. Sw. Airlines Co. v. DOR, 2021 WI 54, ¶32 n.10, 397 Wis. 2d 431, 960 N.W.2d 384.

exemption because their activities are secular. Such an analysis, in LIRC's view, does not violate the First Amendment or Article I, Section 18 of the Wisconsin Constitution.

¶5 We determine that in our inquiry into whether an organization is "operated primarily for religious purposes" within the meaning of Wis. Stat. § 108.02(15)(h)2., we must examine both the motivations and the activities of the organization. Applying this analysis to the facts before us, we conclude that the petitioners are not operated primarily for religious purposes within the meaning of § 108.02(15)(h)2. We further conclude that the application of § 108.02(15)(h)2. as applied to the petitioners does not violate the First Amendment because the petitioners have failed to demonstrate that the statute as applied to them is unconstitutional beyond a reasonable doubt.

¶6 Accordingly, we affirm the decision of the court of appeals.

I

¶7 Each Roman Catholic diocese in Wisconsin has a social ministry arm, referred to as Catholic Charities. As a whole, Catholic Charities' mission "is to provide service to people in need, to advocate for justice in social structures and to call the entire church and other people of good will to do the same."

¶8 The Catholic Charities entity at issue in this case is that of the Diocese of Superior, which we refer to as CCB. Its statement of philosophy indicates that it has "since 1917 been providing services to the poor and disadvantaged as an

expression of the social ministry of the Catholic Church in the Diocese of Superior" and that its "purpose . . . is to be an effective sign of the charity of Christ." In its provision of services, CCB assures that "no distinctions are made by race, sex, or religion in reference to clients served, staff employed and board members appointed." CCB aims to provide services that are "significant in quantity and quality" and not duplicative of services provided by other agencies.

¶9 Occupying the top position in CCB's organizational chart is the bishop of the Diocese of Superior, who exercises control over CCB and its sub-entities. The bishop serves as CCB's president and appoints its membership, whose function is to "provide[] essential oversight to ensure the fulfillment of the mission of Catholic Charities Bureau in compliance with the Principles of Catholic social teaching." CCB's code of ethics, which is "displayed prominently in the program office of all affiliate agencies," likewise sets forth the expectation that "Catholic Charities will in its activities and actions reflect gospel values and will be consistent with its mission and the mission of the Diocese of Superior."

¶10 Under the umbrella of CCB, there are numerous separately incorporated sub-entities. These sub-entities operate "63 programs of service . . . to those facing the challenges of aging, the distress of a disability, the concerns of children with special needs, the stresses of families living in poverty and those in need of disaster relief."

5

¶11 Four sub-entities are involved in this case. The first is Barron County Developmental Services, Inc. (BCDS). BCDS contracts with the Department of Vocational Rehabilitation to provide job placement, job coaching, and an "array of services to assist individuals with disabilities [to] get employment in the community." Prior to December of 2014, BCDS was not affiliated with the Diocese of Superior, and in fact had no religious affiliation at all. At that time, BCDS reached out and requested to become an affiliate agency of the Diocese. It receives no funding from the Diocese.

¶12 The second sub-entity at issue is Black River Industries, Inc. (BRI). It provides services to people with developmental or mental health disabilities, as well as those with a limited income. These services include home-based, community-based, and facility-based job training and daily living services. Among BRI's offerings are a food services program, a document shredding program, and a mailing services program. BRI's funding comes largely from county and state government. It does not receive funding directly from the Diocese.

¶13 Diversified Services, Inc. (DSI) is the third sub-entity implicated in this appeal. It provides work opportunities to individuals with developmental disabilities. Additionally, DSI hires individuals without disabilities for production work. It is not funded by the Diocese, instead

receiving its funding from Family Care, a Medicaid long-term care program,[5] and private contracts.

¶14 Finally, the fourth sub-entity involved is Headwaters, Inc., which provides "various support services for individuals with disabilities," "training services related to activities of daily living," "employment related training services" and additional employment-related support. It also provides Head Start home visitation services, and at one time offered birth-to-three services before a different entity took over that aspect of its operations. Like the other sub-entities, Headwaters is funded primarily through government contracts and does not receive funding from the Diocese.

¶15 These four sub-entities are overseen by CCB, which, among other things, provides management services and consultation; establishes and coordinates the missions of the sub-entities; and approves all capital expenditures, certain sales of real property, and investment policies of the sub-entities. In turn, the sub-entities themselves set organizational goals and make plans to accomplish those goals, employ staff, set program policies, enter into contracts, raise funds, and assure regulatory compliance.

¶16 Additionally, CCB's executive director supervises the operations of each of the sub-entities. However, neither those employed by nor those receiving services from CCB or the sub-entities are required to be of any particular religious faith.

---

[5] See Wis. Admin. Code ch. DHS 10.

Individuals participating in the programs do not receive any religious training or orientation, and CCB and the sub-entities do not try to "inculcate the Catholic faith with program participants."

¶17 In 1972, the Department of Industry, Labor and Human Relations made a determination that CCB was subject to the unemployment compensation law after CCB submitted a form that self-reported the nature of its operations as "charitable," "educational," and "rehabilitative," not "religious."[6] CCB has been making unemployment contributions since that time.

¶18 In 2015, the Douglas County Circuit Court determined that a sub-entity of CCB not involved in the present case was "operated primarily for religious purposes" and thus exempt from contributing to the state unemployment system.[7] The following year, CCB and the sub-entities sought a similar determination that they qualified for the exemption, bringing their claim first to the Department of Workforce Development (DWD).

¶19 DWD denied the petitioners' request to withdraw from the state system. It stated: "It has been determined these organizations are supervised and controlled by the Roman Catholic Church, but it has <u>not</u> been established they are

---

[6] CCB and the sub-entities are exempt from federal income tax pursuant to 26 U.S.C. § 501(c)(3), which provides exemption to, among other entities, those "operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes."

[7] <u>Challenge Ctr., Inc. v. LIRC</u>, Douglas County Case No. 2014CV384 (George L. Glonek, Judge).

operated primarily for religious purposes." CCB and the sub-entities appealed DWD's determination, and an administrative law judge (ALJ) reversed. Consequently, DWD petitioned LIRC for review, and LIRC reversed the ALJ, concluding consistent with the original DWD decision that the petitioners are not operated primarily for religious purposes. It observed that "while services may be religiously motivated and manifestations of religious belief, a separate legal entity that provides essentially secular services and engages in activities that are not religious per se . . . falls outside the scope of Wis. Stat. § 108.02(15)(h)2.," regardless of any affiliation the entity may have with a religious organization.

¶20 Subsequently, CCB and the sub-entities sought judicial review in the circuit court and the pendulum swung again, as the circuit court reversed LIRC's decision. DWD and LIRC appealed, and the court of appeals reversed, reinstating LIRC's decision that CCB and the sub-entities did not establish a religious purpose.[8] Cath. Charities Bureau, Inc. v. LIRC, 2023 WI App 12, 406 Wis. 2d 586, 987 N.W.2d 778. The court of appeals concluded that "for an employee's services to be exempt from unemployment tax the organization must not only have a religious motivation, but the services provided——its activities——must also be primarily religious in nature." Id., ¶33. Such an analysis, in

---

[8] The court of appeals initially certified the appeal to this court, but we denied the certification. See Wis. Stat. § (Rule) 809.61; Cath. Charities Bureau, Inc. v. LIRC, No. 2020AP2007, unpublished certification (Wis. Ct. App. Dec. 7, 2021).

the court of appeals' view, does not violate either the federal or state constitution because "focusing on the stated motivations and the organization's activities allows the reviewing body to conduct an objective, neutral review that is 'highly fact-sensitive' without examining religious doctrine or tenets." Id., ¶54.

¶21 Applying this understanding, the court of appeals determined that "CCB and its sub-entities failed to meet their burden to establish that they are exempt from Wisconsin's unemployment insurance program and that LIRC properly determined that each of the employers was 'operated primarily to administer [or provide] social service programs' that are not 'primarily for religious purposes.'" Id., ¶55. CCB and the sub-entities petitioned for this court's review.

II

¶22 In an appeal from a LIRC determination, we review LIRC's decision rather than that of the circuit court. Masri v. LIRC, 2014 WI 81, ¶20, 356 Wis. 2d 405, 850 N.W.2d 298. Our review is limited by statute. See Wis. Stat. § 108.09(7)(c)6. We may either confirm the commission's order or set it aside on one of three grounds: (1) if the commission acted without or in excess of its powers; (2) if the order was procured by fraud; or (3) if the commission's findings of fact do not support the order. Id. LIRC acts outside of its power when it incorrectly interprets a statute. DWD v. LIRC, 2018 WI 77, ¶12, 382 Wis. 2d 611, 914 N.W.2d 625.

¶23 We will uphold LIRC's findings of fact as long as there is substantial and credible evidence to support them. Friendly Vill. Nursing and Rehab, LLC v. DWD, 2022 WI 4, ¶13, 400 Wis. 2d 277, 969 N.W.2d 245. We review LIRC's legal conclusions, i.e., questions of law, independently of the decisions rendered by the circuit court, the court of appeals, and the commission. Id.; Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21.

¶24 In our review, we are called upon to interpret Wisconsin statutes. Statutory interpretation presents a question of law that we review independently of the determinations of the circuit court, the court of appeals, and the commission. Greenwald Fam. Ltd. P'ship v. Village of Mukwonago, 2023 WI 53, ¶14, 408 Wis. 2d 143, 991 N.W.2d 356; Tetra Tech EC, Inc., 382 Wis. 2d 496, ¶84.

¶25 Additionally, our review is informed by constitutional principles. The application of constitutional principles likewise presents a question of law. St. Augustine Sch. v. Taylor, 2021 WI 70, ¶24, 398 Wis. 2d 92, 961 N.W.2d 635.

III

¶26 We begin with a short summary of Wisconsin's unemployment insurance scheme and then address the competing interpretations of "operated primarily for religious purposes" within the meaning of Wis. Stat. § 108.02(15)(h)2. In examining this question, we address first whether we must look to the purpose of the church in operating the organization or the purpose of the nonprofit organization itself in our analysis.

11

We address second whether the organization's motivations, activities, or both, drive the analysis of whether a purpose is "religious" within the meaning of § 108.02(15)(h)2. Next, we apply our interpretation of the statute to the facts before us. Finally, we examine the petitioners' assertion that such interpretation violates the First Amendment.

A

¶27 The Wisconsin legislature passed the first unemployment compensation law in the nation in 1932.[9] Then, as now, the law evinces a strong public policy in favor of compensating the unemployed. Operton v. LIRC, 2017 WI 46, ¶31, 375 Wis. 2d 1, 894 N.W.2d 426.

¶28 At a macro level, "[t]he system generally provides for collecting limited funds from a large number of employers, particularly during periods of stable employment, then paying out benefits during periods of high unemployment from the funds that have been accumulated." Maynard G. Sautter, Employment in Wisconsin § 12-1 (Matthew Bender 2023). The statutes were enacted "to avoid the risk or hazards that will befall those who, because of employment, are dependent upon others for their livelihood." Princess House, Inc. v. DILHR, 111 Wis. 2d 46, 69, 330 N.W.2d 169 (1983). "Consistent with this policy, Wis. Stat. ch. 108 is 'liberally construed to effect unemployment

---

[9] See Daniel Nelson, The Origins of Unemployment Insurance in Wisconsin, 51 Wis. Mag. Hist. 109, 109 (1967); Operton v. LIRC, 2017 WI 46, ¶57, 375 Wis. 2d 1, 894 N.W.2d 426 (Abrahamson, J., concurring).

12

compensation coverage for workers who are economically dependent upon others in respect to their wage-earning status.'" Operton, 375 Wis. 2d 1, ¶32 (quoting Princess House, 111 Wis. 2d at 62).

¶29 The legislature has recognized the social cost of unemployment and the need to share the burden presented by unemployment. See Wis. Stat. § 108.01(1). "In good times and in bad times unemployment is a heavy social cost, directly affecting many thousands of wage earners. Each employing unit in Wisconsin should pay at least a part of this social cost, connected with its own irregular operations, by financing benefits for its own unemployed workers." Id.

¶30 "Generally, any service for pay for a public, private, or nonprofit employer is employment [covered by ch. 108], but the service must be provided in Wisconsin or be provided for an employer with operations in Wisconsin." Peter L. Albrecht et al., Wisconsin Employment Law § 12.3 (8th ed. 2023). However, some services are statutorily exempt from the "employment" services addressed by the unemployment compensation law. E.g., Wis. Cheese Serv., Inc. v. DILHR, 108 Wis. 2d 482, 486, 322 N.W.2d 495 (Ct. App. 1982) (examining whether an individual is exempt from the unemployment system as an independent contractor); see Sautter, Employment in Wisconsin § 12-3. It is one of those exemptions, which we will refer to as the "religious purposes" exemption, that is at issue in the present case.

¶31 The religious purposes exemption is set forth as part of Wis. Stat. § 108.02(15)(h), which provides in full:

13

"Employment" as applied to work for a nonprofit organization, except as such organization duly elects otherwise with the department's approval, does not include service:

1. In the employ of a church or convention or association of churches;

2. In the employ of an organization operated primarily for religious purposes and operated, supervised, controlled, or principally supported by a church or convention or association of churches; or

3. By a duly ordained, commissioned or licensed minister of a church in the exercise of his or her ministry or by a member of a religious order in the exercise of duties required by such order.

¶32 Specifically, CCB and the sub-entities seek exemption pursuant to subd. 2, which contains two conditions that both must be fulfilled in order for the exemption to apply. First, the subject organization must be "operated primarily for religious purposes." Second, the organization must be "operated, supervised, controlled, or principally supported by a church or convention or association of churches." It is undisputed that the second condition is satisfied, as CCB and the sub-entities are without question "operated, supervised, controlled, or principally supported" by the Diocese of Superior. Our inquiry thus focuses on the first condition only: "operated primarily for religious purposes."

¶33 In addressing the issue presented, we must answer the threshold question of whose purposes we must examine in our analysis——those of the Diocese or those of CCB and the sub-entities. To resolve this inquiry, we look first to the language of Wis. Stat. § 108.02(15)(h)2. Sw. Airlines Co. v.

14

DOR, 2021 WI 54, ¶22, 397 Wis. 2d 431, 960 N.W.2d 384 (citing State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110).

¶34 Like the court of appeals, our review of the plain language of Wis. Stat. § 108.02(15)(h)2. leads us to conclude that "the reviewing body is to consider the purpose of the nonprofit organization, not the church's purpose in operating the organization." Cath. Charities Bureau, 406 Wis. 2d 586, ¶24. There are several textual cues in this language that guide us to our conclusion. We look first to the sentence structure of Wis. Stat. § 108.02(15)(h)2. This structure indicates that the religious purposes exemption applies to "service . . . [i]n the employ" of an "organization," as opposed to service in the employ of a church. The way the sentence is structured, the phrase "operated primarily for religious purposes" modifies the word "organization," not the word "church."

¶35 Such an understanding is confirmed by a look to the surrounding provisions. See Belding v. Demoulin, 2014 WI 8, ¶15, 352 Wis. 2d 359, 843 N.W.2d 373. The subdivision directly before the religious purposes exemption, Wis. Stat. § 108.02(15)(h)1., exempts from the definition of "employment" for unemployment compensation purposes service "[i]n the employ of a church." The subdivision directly after, § 108.02(15)(h)3., exempts service "[b]y a duly ordained, commissioned or licensed minister of a church." Those employed by a church are thus addressed in subdivisions 1. and 3., indicating, as the court of appeals concluded, that "employees

15

who fall under subd. 2. are to be focused on separately in the statutory scheme from employees of a church." Cath. Charities Bureau, 406 Wis. 2d 586, ¶25.

¶36 Thus, a focus on the church's purpose rather than the organization's purpose would render a significant portion of Wis. Stat. § 108.02(15)(h)2. surplusage. See State v. Martin, 162 Wis. 2d 883, 894, 470 N.W.2d 900 (1991) ("A statute should be construed so that no word or clause shall be rendered surplusage and every word if possible should be given effect."). To explain, Wis. Stat. § 108.02(15)(h)2. contains two provisions that both must be fulfilled. In order to be exempt, a nonprofit organization must be "operated primarily for religious purposes" and "operated, supervised, controlled, or principally supported by a church." § 108.02(15)(h)2.

¶37 If we looked to the church's purpose in operating the organization only, then any religiously affiliated organization would always be exempt. A church's purpose is religious by nature, and this focus is reflected in all of its work, including any sub-entities it oversees. If the tax-exempt status of a nonprofit organization operating under the umbrella of a church is predicated on the religious purposes of the church, an organization operated or controlled by a church always will automatically satisfy the first condition. In other words, the second condition of Wis. Stat. § 108.02(15)(h)2. would subsume the first. This would cause the first requirement of the statute to be surplusage, a reading we cannot endorse. We therefore will examine the purpose of the nonprofit

16

organization, and not that of the church, in determining whether a nonprofit organization is "operated primarily for religious purposes."

B

¶38 Having determined that we look to the purpose of CCB and the sub-entities, and not that of the Catholic Church in operating CCB and the sub-entities, we turn next to another methodological disagreement between the parties. CCB and the sub-entities contend that in our inquiry into whether an organization is "operated primarily for religious purposes" we must look primarily to the organization's motivations, while LIRC advances that the organization's activities are paramount.[10]

¶39 Specifically, CCB and the sub-entities argue that the court of appeals incorrectly limited the religious purposes exemption to church-controlled entities with both purposes and

---

[10] Other jurisdictions have taken varying approaches to similar questions. For example, some jurisdictions have considered the activities of an organization in determining religious purpose. See, e.g., Samaritan Inst. v. Prince-Walker, 883 P.2d 3, 8 (Colo. 1994) (concluding that an organization does not "operate primarily for religious purposes" because the "services offered are essentially secular"); Cathedral Arts Project, Inc. v. Dep't of Econ. Opportunity, 95 So. 3d 970, 973 (Fla. Dist. Ct. App. 2012) (determining that although an organization's motivation may be religious, the organization's "primary purpose in operating . . . is to give art instruction to underprivileged children" and it is therefore not entitled to the exemption). Conversely, other jurisdictions have granted a religious purpose exemption based on the motivations of the organization. See, e.g., Dep't of Emp. v. Champion Bake-N-Serve, Inc., 592 P.2d 1370, 1373 (Idaho 1979) (concluding that a bakery operated by Seventh Day Adventist church was operated primarily for religious purposes despite a commercial aspect).

17

activities that are religious.  They assert that the court of appeals' analysis fails to follow the statutory language because the statute refers only to a religious "purpose" and not religious "activities."

¶40  LIRC responds that looking at only an organization's motivation would allow the organization to determine its own status without consideration of its actual function.  It advances that such an interpretation would run afoul of the maxim that tax exemptions are to be narrowly construed.  In LIRC's view, the court of appeals correctly concluded that the term "operated," which appears in the statute, "connotes an action or activity."  See Cath. Charities Bureau, 406 Wis. 2d 586, ¶31.

¶41  Again, we begin our analysis with the language of the statute, and in particular the language at the center of this case:  "operated primarily for religious purposes."  The court of appeals commenced its analysis by examining the key words "operated" and "purposes," and we do likewise.

¶42  An oft-cited dictionary defines "operate" as "to work, perform, or function, as a machine does."  Operate, https://www.dictionary.com/browse/operate (last visited Feb. 27, 2024), see also Operate, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/operate (last visited Feb. 27, 2024) (defining "operate" as "to perform a function").  As the court of appeals concluded, this definition suggests an action being taken——in the context of the statute at issue

18

meaning "<u>what</u> the nonprofit organization does and <u>how</u> it does it." <u>Cath. Charities Bureau</u>, 406 Wis. 2d 586, ¶31.

¶43 This same dictionary defines "purpose" as "the reason for which something exists or is done, made, used, etc." Purpose, https://www.dictionary.com/browse/purpose (last visited Feb. 27, 2024). The use of "reason" in this definition implies "motivation," or as the court of appeals put it, "<u>why</u> the organization acts." <u>Cath. Charities Bureau</u>, 406 Wis. 2d 586, ¶31.

¶44 In examining the meaning of the statute, we must give reasonable effect to every word. <u>State v. Rector</u>, 2023 WI 41, ¶19, 407 Wis. 2d 321, 990 N.W.2d 213. We read the statute as a whole. <u>Belding</u>, 352 Wis. 2d 359, ¶15. Accordingly, both "operated" and "purposes" must be given full effect. In order to illustrate how to do this, we consider first the consequences if our analysis considered motivations only or activities only in determining whether an organization is operated primarily for religious purposes.

¶45 Considering purposes, i.e., motivations, alone would give short shrift to the word "operated." In this scenario, an organization could be exempt based purely on its stated reason for doing what it does, but its actual "operations" would not enter the calculus. Conversely, if we were to consider activities only, then "purposes" would be rendered surplusage. A singular focus on the "operations" of the organization at the expense of the "purpose" would lead us to excise from the

19

analysis the connection between the organization's activities and its religious mission that the statute requires.

¶46 Reading the statute as a whole, the text and structure of Wis. Stat. § 108.02(15)(h)2. indicate that both activities and motivations must be considered in a determination of whether an organization is "operated primarily for religious purposes." Such an interpretation is consistent with the unemployment compensation law's legislatively-recognized purpose. See Wis. Stat. § 108.01; Princess House, 111 Wis. 2d at 61 (explaining that in determining liability under the Unemployment Compensation Act, "the act itself should be put in perspective, and the underlying purpose of the act should be given paramount consideration"). The unemployment compensation law addresses an "urgent public problem" and does so by sharing "fairly" the economic burdens of unemployment. Wis. Stat. § 108.01(1)-(2).

¶47 In light of this, we have stated that the unemployment compensation law is "remedial in nature and should be liberally construed to effect unemployment compensation coverage for workers who are economically dependent upon others in respect to

20

their wage-earning status." Princess House, 111 Wis. 2d at 62.[11] As a corollary to this principle, it follows that if a statute is liberally construed, then exceptions must be narrowly construed. McNeil v. Hansen, 2007 WI 56, ¶10, 300 Wis. 2d 358, 731 N.W.2d 273.

¶48 Correctly demonstrating a narrow construction of the exception, the court of appeals here concluded that looking at an organization's motivations in a vacuum "would cast too broad a net." Cath. Charities Bureau, 406 Wis. 2d 586, ¶37. Sole reliance on self-professed motivation would essentially render an organization's mere assertion of a religious motive

---

[11] Although the United States Supreme Court has in the past applied a similar principle of liberal construction of remedial statutes, see Peyton v. Rowe, 391 U.S. 54, 65 (1968), recent cases suggest a potential step back from this approach. See, e.g., Encino Motorcars, LLC v. Navarro, 584 U.S. __, 138 S. Ct. 1134, 1142 (2018). Nevertheless, we follow (and do not overrule) the Wisconsin approach to our Unemployment Compensation Act and our precedent regarding the interpretation of remedial statutes under the Act. See Operton, 375 Wis. 2d 1, ¶32; Princess House, Inc. v. DILHR, 111 Wis. 2d 46, 62, 330 N.W.2d 169 (1983); see generally Miller v. Hanover Ins. Co., 2010 WI 75, ¶31, 326 Wis. 2d 640, 785 N.W.2d 493; Stuart v. Weisflog's Showroom Gallery, Inc., 2008 WI 22, ¶21, 308 Wis. 2d 103, 746 N.W.2d 762 (explaining that "remedial statutes must be liberally construed to advance the remedy that the legislature intended to be afforded"). The statutory text confirms the original intent of the legislature to provide broad coverage for unemployed workers that is "shared . . . fairly" among employers. See generally Wis. Stat. § 108.01.

dispositive.[12]   See Living Faith, Inc. v. Comm'r of Internal Revenue, 950 F.2d 365, 372 (7th Cir. 1991) ("While we agree with Living Faith that an organization's good faith assertion of an exempt purpose is relevant to the analysis of tax-exempt status, we cannot accept the view that such an assertion be dispositive. Put simply, saying one's purpose is exclusively religious doesn't necessarily make it so.").

¶49 Although the motivations of an organization certainly figure into the analysis, allowing self-definition to drive the exemption would open the exemption to a broad spectrum of organizations based entirely on a single assertion of a religious motivation.[13]  This would run counter to the direction that we construe the exemption narrowly.  Considering the

---

[12] The stopping point of the argument presented by CCB and the sub-entities is unclear.  For example, at the administrative hearing in the present case, the Archbishop of Milwaukee testified that he is responsible for overseeing numerous grammar schools and high schools, 10 hospitals, and five colleges. Under the petitioners' argument, these entities' employees, numbering in the thousands, would seemingly lack coverage under the state unemployment system.

[13] The argument advanced by the petitioners did not garner anywhere close to a majority vote when addressed by the United States Supreme Court.  At oral argument, Justice Thomas's concurrences in both Hosanna-Tabor Evangelical Lutheran Church and Sch. v. Equal Emp. Opportunity Comm'n, 565 U.S. 171, 196-98 (2012) (Thomas, J., concurring) and Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. __, 140 S. Ct. 2049, 2069-70 (2020) (Thomas, J., concurring, joined by Gorsuch, J.), were invoked to support the idea that courts must wholly defer to an organization's good-faith claims instead of examining the activities of the organization.  However, this position was not supported by the majority in either case.

organization's activities in addition to its motivations is in line with the directive that we follow a narrow construction.

¶50 Our decision in Coulee Catholic Schools v. LIRC, 2009 WI 88, 320 Wis. 2d 275, 768 N.W.2d 868, additionally buttresses our conclusion. In that case, the court addressed an issue of whether a teacher's position in a religious school is "ministerial" such that the First Amendment bars suit under the Wisconsin Fair Employment Act.[14]

¶51 In examining this question, the court applied the two-part "primary duties" test. "The first step is an inquiry into whether the organization in both statement and practice has a fundamentally religious mission." Id., ¶48. Second, the court inquires "into how important or closely linked the employee's work is to the fundamental mission of that organization." Id., ¶49.

¶52 Although the legal issue and context were different in Coulee, we agree with the court of appeals that it "provides guidance in understanding the religious purposes exemption

---

[14] The "ministerial exception" recognizes "that the First Amendment protects houses of worship from state interference with the decision of who will teach and lead a congregation." Coulee Cath. Schs., 320 Wis. 2d 275, ¶39. Premised on the "idea that the 'introduction of government standards [in]to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state,'" the exception "recognizes that 'perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large.'" Id. (quoting Rayburn v. Gen. Conf. of Seventh-Day Adventists, 772 F.2d 1164, 1168-69 (4th Cir. 1985)).

23

here."  Cath. Charities Bureau, 406 Wis. 2d 586, ¶43.  To explain, the first step of the primary duties test involves an inquiry into an organization's mission.  In analyzing such a question, the Coulee court examined both the "statement" and "practice" of the organization.  Coulee Cath. Schs., 320 Wis. 2d 275, ¶48.  See also Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. __, 140 S. Ct. 2049, 2067-69 (2020).  In other words, it analyzed both the professions and actions of the organization to determine the organization's "mission."

¶53  The "mission" inquiry in Coulee is analogous to the "purpose" analysis we conduct in the present case.  Indeed, mission and purpose are even listed as synonyms by a popular thesaurus.  Mission, https://www.thesaurus.com/browse/mission (last visited Feb. 27, 2024).  The concepts are thus related, and the Coulee court's analysis of two factors, professions and operations, in its "mission" inquiry supports our examination of similar dual considerations in the "purpose" question in the present case.  See also Our Lady of Guadalupe Sch., 140 S. Ct. at 2067-69.

¶54  Further, the Seventh Circuit's decision in United States v. Dykema, 666 F.2d 1096 (7th Cir. 1981), lends support to the assertion that the organization's activities have a role to play in determining the organization's "purpose."  In Dykema, which involved a determination of a pastor's tax liability, the Seventh Circuit observed that "religious purposes" is a "term of art in tax law" and that the IRS, in order to determine whether such a purpose is present, must examine whether an

24

organization's "actual activities conform to the requirements which Congress has established as entitling them to tax exempt status." Id. at 1101 (emphasis added).

¶55 The Dykema court also emphasized that its inquiry into religious purpose is based on "objective criteria," which "enable the IRS to make the determination required by the statute without entering into any subjective inquiry with respect to religious truth which would be forbidden by the First Amendment." Id. at 1100. It further charted "[t]ypical activities of an organization operated for religious purposes" as including:

> (a) corporate worship services, including due administration of sacraments and observance of liturgical rituals, as well as a preaching ministry and evangelical outreach to the unchurched and missionary activity in partibus infidelium; (b) pastoral counseling and comfort to members facing grief, illness, adversity, or spiritual problems; (c) performance by the clergy of customary church ceremonies affecting the lives of individuals, such as baptism, marriage, burial, and the like; (d) a system of nurture of the young and education in the doctrine and discipline of the church, as well as (in the case of mature and well developed churches) theological seminaries for the advanced study and the training of ministers.

Id. We reproduce this list not to create any requirement for an organization to be determined to have a religious purpose, but merely as an illustration. The Dykema court's listed hallmarks of a religious purpose are by no means exhaustive or necessary conditions and the listed activities may be different for different faiths.

25

¶56 We do not adopt a rigid formula for deciding whether an organization is operated primarily for religious purposes. See Hosanna-Tabor Evangelical Lutheran Church and Sch. v. Equal Emp. Opportunity Comm'n, 565 U.S. 171, 190 (2012). Instead, we agree with the Dykema court that an examination of an organization's activities lends itself to an objective inquiry that does not lead us into a First Amendment quagmire, as will be discussed further below.[15]

¶57 We therefore conclude that in determining whether an organization is "operated primarily for religious purposes" within the meaning of Wis. Stat. § 108.02(15)(h)2., we must examine both the motivations and the activities of the organization.

---

[15] Our examination of an organization's activities also finds support in a federal law utilizing the same language as the statute we examine here. See 26 U.S.C. § 3309(b)(1)(B). A report of the House Ways and Means Committee on that law sets forth an example of its application that focuses on an organization's activities:

> Thus, the services of the janitor of a church would be excluded, but services of a janitor for a separately incorporated college, although it may be church related, would be covered. A college devoted primarily to preparing students for the ministry would be exempt, as would a novitiate or a house of study training candidates to become members of religious orders. On the other hand, a church related (separately incorporated) charitable organization (such as, for example, an orphanage or a home for the aged) would not be considered under this paragraph to be operated primarily for religious purposes.

H.R. Rep. No. 91-612, at 44 (1969). Congress thus envisioned that an examination of activities, and not merely motivations, would be undertaken given the language we examine in this case.

C

¶58 We turn next to apply our statutory interpretation to the facts before us. The burden to establish an exemption is on CCB and the sub-entities. See Princess House, 111 Wis. 2d at 66; Sw. Airlines, 397 Wis. 2d 431, ¶24 (explaining that "[t]he burden is on the party seeking the exemption to prove its entitlement" and "taxation is the rule and exemption is the exception").

¶59 CCB and the sub-entities profess to have a religious motivation. Specifically, they state that their services "are based on gospel values and the principles of the Catholic Social Teachings." Indeed, it is part of CCB's mission to "carry on the redeeming work of our Lord by reflecting gospel values and the moral teaching of the church." We accept these statements at face value, and LIRC does not argue that these assertions of religious motivation are insincere, fraudulent, or otherwise not credible. Cf. Holy Trinity Cmty. Sch., Inc. v. Kahl, 82 Wis. 2d 139, 155, 262 N.W.2d 210 (1978) (indicating that the court is "obliged to accept the professions of the school" as to its affiliation and "to accord them validity without further inquiry" but the court may "look behind such decisions where there is evidence of fraud or collusion").

¶60 However, accepting an organization's motivations does not end the inquiry as we must also examine its activities. We look for guidance from prior cases to further the analysis. In Dykema, the court's examination of activities focused on whether an organization participated in worship services, religious

27

outreach, ceremony, or religious education. <u>Dykema</u>, 666 F.2d at 1100. Here, such criteria weigh in favor of a determination that CCB's and the sub-entities' activities are not "primarily" religious in nature. The record demonstrates that CCB and the sub-entities, which are organized as separate corporations apart from the church itself, neither attempt to imbue program participants with the Catholic faith nor supply any religious materials to program participants or employees. Although not required, these would be strong indications that the activities are primarily religious in nature.

¶61 Our own precedent, albeit in another First Amendment context, further bolsters this conclusion. In <u>Coulee Catholic Schools</u>, 320 Wis. 2d 275, ¶48, we distinguished "one religiously-affiliated organization committed to feeding the homeless [that] has only a nominal tie to religion" from "another religiously-affiliated organization committed to feeding the homeless [that] has a religiously infused mission involving teaching, evangelism, and worship" for purposes of the ministerial exception. CCB and the sub-entities fit into the former category. Both employment with the organizations and services offered by the organizations are open to all participants regardless of religion.

¶62 CCB's and the sub-entities' activities are primarily charitable and secular. The sub-entities provide services to individuals with developmental and mental health disabilities. These activities include job training, placement, and coaching, as well as services related to activities of daily living. CCB

28

provides background support and management services for these activities——a wholly secular endeavor.  See supra, ¶¶10-15.

¶63 Such services can be provided by organizations of either religious or secular motivations, and the services provided would not differ in any sense.  This is illustrated by a historical look at one of CCB's sub-entities, BCDS.  As noted by the court of appeals, BCDS was not under the CCB umbrella until 2014, before which it had no affiliation with any religious organization.  See Cath. Charities Bureau, 406 Wis. 2d 586, ¶59.  Yet the services provided before and after BCDS's partnership with CCB commenced were exactly the same.  We agree with the court of appeals that "[t]he fact that the manner in which BCDS carried out its mission did not change after it became an affiliate of CCB supports our conclusion that BCDS' purpose and operations are not primarily religious."  Id.

¶64 The other three sub-entities at issue offer services comparable to those offered by BCDS.  In other words, they offer services that would be the same regardless of the motivation of the provider, a strong indication that the sub-entities do not "operate primarily for religious purposes."

¶65 This result is further supported with a look to federal law.  We observe that Wisconsin's religious purposes exemption contains verbatim language to a provision of federal law, with which Wisconsin's law was enacted to conform.  See 26 U.S.C. § 3309(b)(1)(B); 1971 S.B. 330 (noting that the proposed changes to Wisconsin law "will bring Wisconsin's law in line with the 1970 amendments to the federal unemployment tax act"

29

and that "[a]ny less coverage would cost federal tax credits"). A report of the House Ways and Means Committee on that federal law indicates that, identical to Wisconsin's law, it:

> excludes services of persons where the employer is a church or convention or association of churches, but does not exclude certain services performed for an organization which may be religious in orientation unless it is operated primarily for religious purposes and is operated, supervised, controlled, or principally supported by a church (or convention or association of churches).

H.R. Rep. No. 91-612, at 44 (1969). Importantly, the House Report continues and provides examples of employment that would and would not be entitled to the exemption:

> Thus, the services of the janitor of a church would be excluded, but services of a janitor for a separately incorporated college, although it may be church related, would be covered. A college devoted primarily to preparing students for the ministry would be exempt, as would a novitiate or a house of study training candidates to become members of religious orders. On the other hand, a church related (separately incorporated) charitable organization (such as, for example, an orphanage or a home for the aged) would not be considered under this paragraph to be operated primarily for religious purposes.

Id. (emphasis added).

¶66 Comparing the services offered by CCB and the sub-entities here to the listed examples, the "orphanage" or "home for the aged" is analogous. The services provided by a religiously run orphanage and a secular one do not differ in any meaningful sense. The same is true of a "home for the aged." And the same principle applies to the developmental services provided by the sub-entities at the center of this case.

¶67 Although CCB and the sub-entities assert a religious motivation behind their work, the statutory language indicates that this is not enough to receive the exemption. An objective examination of the actual activities of CCB and the sub-entities reveals that their activities are secular in nature. We therefore conclude that CCB and the sub-entities are not operated primarily for religious purposes within the meaning of Wis. Stat. § 108.02(15)(h)2.

IV

¶68 Finally, we examine the petitioners' assertion that the above statutory interpretation violates the First Amendment.[16] Specifically, they advance that such analysis and conclusion creates a conflict with the First Amendment to the United States Constitution by violating both the Establishment Clause and Free Exercise Clause.

¶69 Together referred to as the Religion Clauses, the Establishment and Free Exercise clauses provide in their entirety: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

¶70 The Establishment Clause protects against three main evils: sponsorship, financial support, and active involvement

---

[16] In full, the First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

31

of the sovereign in religious activity. Jackson v. Benson, 218 Wis. 2d 835, 856, 578 N.W.2d 602 (1998) (citing Walz v. Tax Comm'n, 397 U.S. 664, 668 (1970)). In other words, it operates to prohibit the government from enacting laws that "aid one religion, aid all religions, or prefer one religion over another." Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 216 (1963) (quoting Everson v. Bd. of Educ. of Ewing Twp., 330 U.S. 1, 15 (1947)).

¶71 It further prohibits the excessive entanglement of the state in religious matters, a principle known as the entanglement doctrine. St. Augustine Sch., 398 Wis. 2d 92, ¶42. Excessive entanglement occurs "if a court is required to interpret church law, policies, or practices." L.L.N. v. Clauder, 209 Wis. 2d 674, 687, 563 N.W.2d 434 (1997). Such an inquiry is prohibited by the First Amendment. Id. However, "a court may hear an action if it will involve the consideration of neutral principles of law." Id.

¶72 On the other hand, the Free Exercise Clause assures "the right to harbor religious beliefs" by "protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 524 (2022). It protects religious organizations' right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Coulee Cath. Schs., 320 Wis. 2d 275, ¶37 (quoting Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952)).

32

¶73 Both Religion Clauses inform a doctrine known as the church autonomy principle, which "is perhaps best understood as marking a boundary between two separate polities, the secular and the religious, and acknowledging the prerogatives of each in its own sphere." Korte v. Sebelius, 735 F.3d 654, 677 (7th Cir. 2013). "The church-autonomy doctrine respects the authority of churches to select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions free from governmental interference." Id. (quoted source omitted). In other words, it protects religious institutions from "secular control or manipulation." Kedroff, 344 U.S. at 116.

¶74 The Religion Clauses are inherently in tension with each other. We acknowledged this complicated interplay in State v. Yoder, 49 Wis. 2d 430, 444, 182 N.W.2d 539 (1971) aff'd Wisconsin v. Yoder, 406 U.S. 205 (1972). Indeed, the Religion Clauses are "not the most precisely drawn portions of the Constitution." Walz, 397 U.S. at 668. Both clauses are "cast in absolute terms," id., and therefore have the tendency to "overlap, can conflict, and cannot always be squared on any strict theory of neutrality." Yoder, 49 Wis. 2d at 444.

¶75 The United States Supreme Court has also acknowledged these tensions, instructing that "[a]dherence to the policy of neutrality" is paramount to prevent "the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice." Walz, 397

33

U.S. at 669-70. At the same time, it emphasizes that strict adherence is not always feasible:

> The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

Id. at 669.

¶76 A religious institution's First Amendment rights are not unlimited. Just as there are limitations on First Amendment free speech, i.e., the proverbial prohibition of yelling "fire" in a crowded theater,[17] so too are there limitations here. The challenge is to balance the competing interests. We are assisted in achieving this balance by a review of precedent, and by a review of how other jurisdictions have navigated the challenge.

¶77 An as-applied challenge, such as that brought by CCB and the sub-entities, requires an assessment of the merits of the challenge by considering the facts of the particular case in

---

[17] See Schenck v. United States, 249 U.S. 47, 52 (1919).

34

front of the court.[18]  State v. Hamdan, 2003 WI 113, ¶43, 264 Wis. 2d 433, 665 N.W.2d 785.  For an as-applied challenge to succeed, the challenger must demonstrate that the challenger's constitutional rights were actually violated.  State v. Roundtree, 2021 WI 1, ¶18, 395 Wis. 2d 94, 952 N.W.2d 765.  If such a violation occurred, the operation of the law is void as to the facts presented for the party asserting the claim.  Id. We presume that the statute is constitutional, and the party raising a constitutional challenge must prove that the challenged statute has been applied in an unconstitutional manner beyond a reasonable doubt.  Id.; State v. Christen, 2021 WI 39, ¶32, 396 Wis. 2d 705, 958 N.W.2d 746; State v. Wood, 2010 WI 17, ¶15, 323 Wis. 2d 321, 780 N.W.2d 63.

¶78 With this standard in mind, we turn now to the petitioners' constitutional claims to determine whether CCB and

---

[18] There are two major types of constitutional challenges: facial and as-applied.  State v. Roundtree, 2021 WI 1, ¶17, 395 Wis. 2d 94, 952 N.W.2d 765.  A party challenging a law as unconstitutional on its face must show that the law cannot be constitutionally enforced under any circumstances.  Id.  In contrast, in an as-applied challenge, the court assesses the merits of the challenge by considering the facts of the particular case before it.  Id., ¶18.  The parties' briefing was not particularly clear regarding which type of challenge CCB and the sub-entities bring here.  Both LIRC and the court of appeals interpreted the petitioners' challenge to be an as-applied challenge, and we do the same.  See Cath. Charities Bureau, 406 Wis. 2d 586, ¶47 ("[W]e note that the parties do not argue that the statute itself violates the First Amendment, meaning that CCB does not assert a facial constitutional challenge.").  In any event, the standard for a facial challenge is more stringent, and if an as-applied challenge fails, then a facial challenge will also necessarily fail because the law can be constitutionally applied in at least one circumstance.

the sub-entities have made the requisite showing that Wis. Stat. § 108.02(15)(h)2. has been unconstitutionally applied to them beyond a reasonable doubt.  CCB and the sub-entities claim that LIRC's statutory interpretation leads to a violation of the Establishment Clause and the Free Exercise Clause in three ways: (1) by causing an excessive state entanglement with religion, (2) by violating the church autonomy principle, and (3) by discriminating "against religious entities with a more complex polity" and "penalizing CCB for its Catholic beliefs regarding how it must serve those most in need."  We address each argument in turn.

A

¶79  CCB and the sub-entities assert initially that LIRC's interpretation of the statutory exemption violates the Establishment Clause by occasioning an excessive state entanglement with religion.  Specifically, they argue that examination of an organization's activities "requires Wisconsin courts (and government officials) to conduct an intrusive inquiry into the operations of religious organizations that seek the religious purposes exemption."

¶80  However, the protection provided by the Establishment Clause is not a blanket protection against any type of governmental inquiry into a religious organization.  There are certain instances that require some investigation, including determining tax liability or the applicability of a tax exemption.  See Walz, 397 U.S. at 675-76.  In fact, investigations into tax-exempt status are consistent with a

36

long-standing tradition of treating religious organizations equally under the law.  See id. at 680.  Indeed, both taxation of churches and exemption "occasion[] some degree of involvement with religion."  Id. at 674.

¶81 The Establishment Clause does not treat religion as a third rail that courts cannot touch.  Rather, it ensures that the inevitable "degree of involvement" in such a determination does not cross into an evaluation of religious dogma.  The Supreme Court, in fact, has "upheld government benefits and tax exemptions that go to religious organizations, even though those policies have the effect of advancing or endorsing religion," Am. Legion v. Am. Humanist Ass'n, 588 U.S. __, 139 S. Ct. 2067, 2092 (2019) (Kavanaugh, J., concurring).

¶82 Although such an inquiry necessarily links the government with religious organizations, "some degree of involvement" does not offend the First Amendment.  Walz, 397 U.S. at 674; see also id. at 697 n.1 (Harlan, J., concurring). An inquiry evaluating "the scope of charitable activities in proportion to doctrinal pursuits may be difficult," but such difficulty "does not render it undue interference with religion" as long as it "does not entail judicial inquiry into dogma and belief."  Id. at 697 n.1 (Harlan, J., concurring).

¶83 The truth or falsity of a religious belief is not a proper matter for us, or any other court to decide, but courts still must answer "delicate question[s]" to avoid "allowing every person to make his own standards on matters of conduct in which society as a whole has important interests."  Yoder, 406

37

U.S. at 215-16. The key is for any inquiry a court undertakes to remain on the right side of the line and not involve an examination into the religious beliefs, practices, or dogma of an organization. Cf. St. Augustine Sch., 398 Wis. 2d 92, ¶¶47-49. For example, in St. Augustine School, we observed that an examination of "a school's professions that are published on its public website or set forth in filings with the state does not necessarily require any investigation or surveillance into the practices of the school." Id., ¶48. Consideration of "professions" without any surveillance of whether an organization's practices are consistent with a particular religious dogma ensures that the inquiry remains on the right side of the line. Id., ¶49.

¶84 Such is our challenge here. We begin the inquiry by again looking at the statute at issue. As set forth above, the language of Wis. Stat. § 108.02(15)(h)2. dictates that we examine both the organization's motivations and activities to determine whether the organization is "operated primarily for religious purposes" and thus is entitled to exemption from unemployment tax.

¶85 Examining both the motivations and activities of the organization requires minimal judicial inquiry into religion, as there is no examination of whether CCB's or the sub-entities' activities are consistent or inconsistent with Catholic doctrine. A court need only determine what the nature of the motivations and activities of the organizations are—not whether they are "Catholic" enough to qualify for the exemption.

38

¶86 Again, this inquiry requires "some degree of involvement" with religion. See Walz, 397 U.S. at 674. But rather than necessarily creating a constitutional problem, such an inquiry is inherent in any statutory scheme that offers tax exemption to religious entities. Id.; see id. at 675 ("There is no genuine nexus between tax exemption and establishment of religion."). The review we endorse in this case is a neutral and secular inquiry based on objective criteria, examining the activities and motivations of a religious organization. See St. Augustine Sch., 398 Wis. 2d 92, ¶5 (concluding that a "neutral and secular inquiry" into a religious organization is constitutional); Dykema, 666 F.2d at 1100 (applying "objective criteria" to an investigation into a religious organization's activities.)

¶87 Our conclusion is consistent with those of other courts that have examined similarly "delicate" questions. For example, in Dykema, the Seventh Circuit examined an organization's actual activities, just as we do here. Id. ("Objective criteria for examination of an organization's activities . . . enable the IRS to make the determination required by the statute without entering into any subjective inquiry with respect to religious truth which would be forbidden by the First Amendment."). Our examination of the motivations and actual activities of an organization here is akin to our consideration of a school's corporate documents, professions with regard to self-identification and affiliation, and website to which we gave a constitutional seal of approval in St.

39

Augustine School. 398 Wis. 2d 92, ¶5. This "neutral and secular" inquiry does not intrude on questions of religious dogma. See id.

¶88 Further, a look to history strongly supports our consideration of an organization's activities, to which CCB and the sub-entities object. As detailed below, this history establishes two essential principles for our purposes here. First, that an inquiry into "purpose" that examines an organization's actual activities has long been established in statutory enactments and the common law, and second, that courts have embraced, rather than shunned, a judicial inquiry into an organization's actual activities in order to make a determination of "purpose" to inform whether the organization qualifies for exemption. Our decision here is thus consistent with court's historical treatment of similar questions.

¶89 Religious tax exemption has been traced from ancient times through the British common law. See John W. Whitehead, Tax Exemption and Churches: A Historical and Constitutional Analysis, 22 Cumb. L. Rev. 521, 524-36 (1992). British common law, and certain colonial legislatures, widely granted property tax exemptions to church property. John Witte, Jr., Tax Exemption of Church Property: Historical Anomaly or Valid Constitutional Practice?, 64 S. Cal. L. Rev. 363, 372-74 (1991). The law of equity, on the other hand, also accorded tax exemption to church properties, but only to those which were devoted to "charitable uses." Id. at 375. Thus, there has historically been some examination of a property's actual use,

40

not just reliance on an organization's religious character. In other words, courts have long placed import on what a religious organization does, and not just on what it says.

¶90 As these exemptions evolved, statutory language likewise focused on an organization's "purpose." Indeed, from the earliest statutory enactments regarding tax exemption for religious entities, an examination of an organization's activities has been part and parcel of the inquiry.

¶91 For instance, the Wilson-Gorman Tariff Act of 1894, one of the earliest tax statutes that referenced an exemption for religious purposes, provided a tax exemption to a flat income tax. It stated:

> "[N]othing herein contained shall apply to . . . corporations, companies, or associations organized and conducted solely for charitable, religious, or educational purposes, including fraternal beneficiary associations." Though the law was declared unconstitutional by the Supreme Court in 1895, the exemption language contained in the act would provide the cornerstone for tax legislation involving charitable organizations for the next century.

Paul Arnsberger, et al., A History of the Tax-Exempt Sector: An SOI Perspective, IRS Stat. of Income Bull. 105, 106-07 (Winter 2008), www.irs.gov/pub/irs-soi/tehistory.pdf. Similarly, a subsequent enactment, the Revenue Act of 1909, granted exemption to "any corporation or association organized and operated exclusively for religious, charitable, or educational purposes, no part of the net income of which inures to the benefit of any

41

private stockholder or individual." Id. at 107 (emphasis added).

¶92 The ubiquity of religious tax exemptions and the analytical consequences of such exemptions have been recognized by the United States Supreme Court. Specifically, the Walz Court observed that "Congress, from its earliest days, has viewed the Religion Clauses of the Constitution as authorizing statutory real estate tax exemption to religious bodies," noting several examples from the early 1800's. Walz, 397 U.S. at 677. As stated above, however, the Walz court also emphasized that "some degree of involvement" with religion is a necessary consequence of offering tax exemption to religious entities. Id. at 674.

¶93 Tax exemptions for entities with a religious "purpose" being well-established in historical enactments, it is paramount that there be a mechanism for determining if an organization qualifies. See Ecclesiastical Order of Ism of Am, Inc. v. Chasin, 653 F. Supp. 1200, 1205 (E.D. Mich. 1986) ("Without [an examination of religious activities], it would be difficult to see how any church could qualify as a tax exempt organization 'for religious purposes.'"). Such an endeavor inherently requires judicial inquiry and has on many occasions throughout the history of both federal and state law resulted in denial of

tax exemption where religion is claimed as the basis of the exemption.[19]

¶94 For the above reasons, we conclude that CCB and the sub-entities have failed to demonstrate beyond a reasonable doubt an unconstitutional entanglement with religion. The motivations and activities framework dictated by the language of Wis. Stat. § 108.02(15)(h)2. does not require the court to stray from a neutral and secular inquiry to an impermissible examination of religious dogma.

B

¶95 CCB and the sub-entities contend next that LIRC's interpretation violates the church autonomy principle. Namely, they argue that the church autonomy principle is violated because LIRC's interpretation penalizes the choice CCB made to structure itself and its sub-entities as corporations separate from the church itself. CCB and the sub-entities advance that the church autonomy principle is violated by "divid[ing] up religious bodies according to secular principles." They point

---

[19] See, e.g., Gibbons v. District of Columbia, 116 U.S. 404, 407 (1886); All Saints Par. v. Inhabitants of Town of Brookline, 59 N.E. 1003, 1004 (Mass. 1901); Trinity Church v. City of New York, 10 How. Pr. 138, 140-41 (N.Y. Sup. Ct. 1854); In re City of Pawtucket, 52 A. 679, 679 (R.I. 1902); Frederick Cnty. Comm'rs v. Sisters of Charity of Saint Joseph, 48 Md. 34, 43 (Md. 1878); see also Waushara County v. Graf, 166 Wis. 2d 442, 462-63, 480 N.W.2d 16 (1992); Midtown Church of Christ, Inc. v. City of Racine, 83 Wis. 2d 72, 73-74, 264 N.W.2d 281 (1978); John W. Whitehead, Tax Exemption and Churches: A Historical and Constitutional Analysis, 22 Cumb. L. Rev. 521, 545 n.184 (1992) (collecting cases both upholding and disallowing property tax exemptions for churches and other religious organizations).

to Kedroff, 344 U.S. 94, to assert that the government is thereby "interfering with the Church's internal governance," which adversely affects the faith and mission of the church itself.

¶96  Kedroff illustrates the type of ecclesiastical governance matters protected by the church autonomy principle. At issue in Kedroff was an inter-church controversy over the right to use a Russian Orthodox cathedral in New York City.  Id. at 96-97.  The controversy arose between the North American Russian Orthodox churches, which claimed the right to use the cathedral belonged to an archbishop elected by them, and the Supreme Court Authority, which claimed the right belonged instead to an archbishop appointed by the patriarch in Moscow. Id.  New York's highest court ruled in favor of the North American churches, based on a state law requiring every Russian Orthodox church in New York to recognize the determination of the governing body of the North American churches as authoritative.  Id. at 99 n.3.

¶97  The Kedroff Court concluded that the state statute at issue was unconstitutional because it allowed the "power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment" by "displac[ing] one church administrator with another . . . [thereby] pass[ing] the control of matters strictly ecclesiastical from one church authority to another."  Id. at 119.  The right to acquire the cathedral was determined to be "strictly a matter of ecclesiastical government."  Id. at 115.

44

¶98 In contrast to the New York statute at issue in Kedroff, Wis. Stat. § 108.02(15)(h)2. neither regulates internal church governance nor mandates any activity. Section 108.02(15)(h)2. defines what employment is for the purposes of unemployment insurance without reference to any religious principles or any attempt to control internal church operations. Put simply, it does not concern matters that are "strictly" or even remotely "ecclesiastical," which belong to the church alone. See id.

¶99 CCB and the sub-entities claim that viewing their motives and activities separate from those of the church penalizes their "choice to be 'structured as separate corporations'——a religious decision grounded in church polity and internal governance." On the contrary, the claim that in order to receive the exemption the church is now required to structure itself as a single entity rather than separately incorporated subsidiaries is unpersuasive. The statute at issue dictates that it is the motivation and activities of the non-profit that determine its tax-exempt status, not its corporate structure.

¶100 It is not difficult to imagine a non-profit organization structured as a separate sub-entity of a church that is "operated primarily for religious purposes," that is, with both motivations and activities that are religious. For example, if one of the religiously-motivated sub-entities in this case partook in activities such as those cited by the Dykema court as indicative of a religious purpose, see supra,

45

¶55, it would have a stronger argument that, despite being incorporated separately from a religious institution, it is nevertheless "operated primarily for religious purposes" within the meaning of Wis. Stat. § 108.02(15)(h)2.[20] Thus, CCB and the sub-entities have failed to demonstrate that the church autonomy principle has been violated beyond a reasonable doubt because the statute does not interfere with its internal governance or any ecclesiastical matters.

C

¶101 Next, CCB and the sub-entities claim that LIRC's proposed interpretation as applied to them abandons "[the] bedrock principle of neutrality among religions" and violates the Free Exercise Clause in at least two ways. First, CCB and the sub-entities advance that it violates the principle of neutrality because "it discriminates against religious entities with a more complex polity." In other words, CCB and the sub-entities contend that the Catholic Church is penalized under LIRC's interpretation for "organizing itself as a group of

---

[20] See also Schwartz v. Unemployment Ins. Comm'n, 895 A.2d 965, 970 (Me. 2006) (concluding that a nonprofit organization which, in part, provides healthcare to island communities, is operated primarily for religious purposes because of its religious motivations and activities including bringing pastors to island communities, offering Christmas programs, and employing clergy members); Peace Lutheran Church v. State, Unemployment Appeals Comm'n, 906 So. 2d 1197, 1199-1200 (Fla. Dist. Ct. App. 2005) (determining that a child care center located at a church was operated primarily for religious purposes because it provided outreach for the church and its "religious purposes pervade all aspects of the school/day care center.").

46

separate corporate bodies——in contrast to other religious entities that include a variety of ministries as part of a single incorporated or unincorporated body."

¶102 Second, CCB and the sub-entities claim that LIRC's interpretation is not neutral because it penalizes them "for [their] Catholic beliefs regarding how [they] must serve those most in need." They point to LIRC's and the court of appeals' decisions as "identifying [certain[21]] characteristics of CCB's ministry as factors favoring denial of an otherwise-available exemption." Such an interpretation, in the petitioners' view, "flies in the face of Catholic beliefs about care for the poor" and "favors religious groups that require those they serve to adhere to the faith of that group or be subject to proselytization."

¶103 As a threshold matter, a party making a free exercise challenge must demonstrate that the challenged law burdens their religious exercise in a constitutionally significant way. "[T]he Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights." Tony and Susan Alamo Found. v. Sec'y of

---

[21] LIRC and the court of appeals observe that CCB does not engage in any of the following activities: inculcating Catholic faith; teaching the Catholic religion; evangelizing or participating in religious rituals or worship services; requiring employees, participants or board members to be of Catholic faith; requiring attendance at religious training, orientation, or services; and disseminating religious materials.

Labor, 471 U.S. 290, 303 (1985); see also Sch. Dist. of Abington Twp., 374 U.S. at 223 ("[I]t is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion."). If such a burden has been shown, then the analysis proceeds to the second step, where a party may carry its burden of proving a free exercise violation by showing that a governmental entity has burdened a sincere religious practice pursuant to a policy that is not "neutral" or "generally applicable." Bremerton, 507 U.S. at 525.

¶104 Importantly for our Free Exercise analysis, LIRC asserts that CCB and the sub-entities have not shown that "the unemployment insurance system burdens their religious beliefs." In LIRC's view, "[i]nclusion in the unemployment program is not a constitutionally significant burden." LIRC's argument continues: "The commission's interpretation does not prohibit the Diocese or the employers from engaging in any activity. The employers have participated in the State unemployment insurance program for many years and do not contend that their participation was a significant or substantial burden on their religious practices or beliefs."

¶105 A look to United States Supreme Court precedent illustrates that LIRC's position is correct. "[T]o the extent that imposition of a generally applicable tax merely decreases the amount of money appellant has to spend on its religious activities, any such burden is not constitutionally significant." Jimmy Swaggart Ministries v. Bd. of Equalization

48

of Cal., 493 U.S. 378, 391 (1990). "[T]he very essence of such a tax is that it is neutral and nondiscriminatory on questions of religious belief." Id. at 394; see Hernandez v. Comm'r of Internal Revenue, 490 U.S. 680, 699-700 (1989) (concluding that the burden imposed by a provision of the Internal Revenue Code governing charitable deduction was "no different from that imposed by any public tax or fee" and that even a "substantial burden would be justified by the 'broad public interest in maintaining a sound tax system,' free of 'myriad exceptions flowing from a wide variety of religious beliefs.'") (quoted source omitted); accord Coulee Cath. Schs., 320 Wis. 2d 275, ¶65 ("General laws related to building licensing, taxes, social security, and the like are normally acceptable.").

¶106 Such is the nature of the unemployment tax at issue here. CCB and the sub-entities have not identified how the payment of unemployment tax prevents them from fulfilling any religious function or engaging in any religious activities. As the United States Supreme Court said, the decrease in the money available for religious or charitable activities that comes with paying a generally applicable tax is not a constitutionally significant burden. Jimmy Swaggart Ministries, 493 U.S. at 391. CCB and the sub-entities thus cannot surmount the threshold inquiry to demonstrate a Free Exercise violation. Because CCB and the sub-entities have failed to demonstrate that the statute imposes a constitutionally significant burden on their religious practice, we need not address the petitioners' argument that the statute violates principles of neutrality.

49

¶107 Accordingly, we conclude that CCB and the sub-entities have therefore not met their burden under their Free Exercise claim to show that the law as-applied to them is unconstitutional beyond a reasonable doubt.[22]

V

¶108 In sum, we determine that in our inquiry into whether an organization is "operated primarily for religious purposes" within the meaning of Wis. Stat. § 108.02(15)(h)2., we must examine both the motivations and the activities of the organization. Applying this analysis to the facts before us, we conclude that the petitioners are not operated primarily for religious purposes within the meaning of § 108.02(15)(h)2. We further conclude that the application of § 108.02(15)(h)2. as applied to the petitioners does not violate the First Amendment because the petitioners have failed to demonstrate that the statute as applied to them is unconstitutional beyond a reasonable doubt.

¶109 Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

---

[22] To the extent that CCB and the sub-entities argue that Wis. Stat. § 108.02(15)(h)2. is facially unconstitutional, such a challenge also fails. For a facial challenge to be successful, it must be demonstrated that the law cannot be constitutionally enforced under any circumstances. Roundtree, 395 Wis. 2d 94, ¶17. Our conclusion that § 108.02(15)(h)2. can be constitutionally enforced under the present circumstances necessarily precludes such an argument.

50

¶110 REBECCA GRASSL BRADLEY, J.   *(dissenting).*

"Render therefore unto Caesar the things which are Caesar's; and unto God the things that are God's."

Matthew 22:21 (King James).

¶111 The State of Wisconsin gives a tax exemption to any nonprofit organization "operated primarily for religious purposes and operated . . . by a church . . . ." Wis. Stat. § 108.02(15)(h)2. Catholic Charities Bureau, Inc. and four of its sub-entities (collectively, "Catholic Charities") are operated primarily for a religious purpose——fulfillment of the command of Jesus Christ himself to serve others——and operated by the Roman Catholic Diocese of Superior, Wisconsin. The majority rewrites the statute to deprive Catholic Charities of the tax exemption, rendering unto the state that which the law says belongs to the church.

¶112 Impermissibly entangling the government in church doctrine, the majority astonishingly declares Catholic Charities are not "operated primarily for religious purposes" because their activities are not "religious in nature." Majority op., ¶60. The statute, however, requires only that a nonprofit be operated primarily for a religious reason. "The statute is neutral as to the type of service an organization provides; it speaks only in terms of the purpose of the organization." Cathedral Arts Project, Inc. v. Dep't of Econ. Opportunity, 95 So. 3d 970, 975 (Fla. Dist. Ct. App. 2012) (Swanson, J., dissenting in part, and dissenting from the judgment).

1

¶113 The majority's misinterpretation of the exemption renders the statute in violation of the First Amendment of the United States Constitution as well as the Wisconsin Constitution. By focusing on whether a nonprofit primarily engages in activities that are "religious in nature," the majority transforms a broad exemption into a denominational preference for Protestant religions and a discriminatory exclusion of Catholicism, Judaism, Islam, Sikhism, Hinduism, Buddhism, Hare Krishna, and the Church of Latter Day Saints, among others. The First Amendment forbids the government from such religious discrimination and commands neutrality among religions in the provision or denial of a government benefit.

¶114 The majority's misinterpretation also excessively entangles the government in spiritual affairs, requiring courts to determine what religious practices are sufficiently religious under the majority's unconstitutional test. The majority says secular entities provide charitable services, so such activities aren't religious at all, even when performed by Catholic Charities. The majority's determination directly contradicts Catholic Charities' faith:

> The [Catholic] Church's deepest nature is expressed in her three-fold responsibility: of proclaiming the word of God (kerygma-martyria), celebrating the sacraments (leitourgia), and exercising the ministry of charity (diakonia). These duties presuppose each other and are inseparable. For the Church, charity is not a kind of welfare activity which could equally well be left to others, but is a part of her nature, an indispensable expression of her very being.

2

Pope Benedict XVI, Deus Caritas Est, ¶25 (2005).[1] Courts should be uncomfortable judging matters of faith. Not only does the constitution forbid the exercise, but courts are susceptible to mischaracterizing deeply religious activities, which for some faith traditions include dancing, Bhakti-yoga, and sharing a meal, as amicus curiae, International Society for Krishna Consciousness and the Sikh Coalition, informs this court. The majority instead looks through a seemingly Protestant lens to deem works of charity worthy of the exemption only if accompanied by proselytizing—a combination forbidden by Catholicism, Judaism, and many other religions.[2]

¶115 The majority mangles Wis. Stat. § 108.02(15)(h)2. to reflect its policy preferences, supplanting the law actually enacted by the people's representatives in the legislature. The majority's activism renders the exemption unconstitutional. I dissent.[3]

---

[1] https://www.vatican.va/content/benedict-xvi/en/encyclicals/documents/hf_ben-xvi_enc_20051225_deus-caritas-est.html.

[2] Amicus Br. Professors Douglas Laycock & Thomas C. Berg, at 15-16 (internal citations omitted) ("Many evangelical Christians view conversion and overt worship as indispensable elements of their charitable activities. But Catholics and Jews view service itself as a distinct mode of worship that should remain separate from proselytizing.").

[3] Continuing its telling trend, the majority refuses to address any arguments against its desired result. Clarke v. Wis. Elections Comm'n, 2023 WI 79, ¶206, 410 Wis. 2d 1, 998 N.W.2d 370 (Rebecca Grassl Bradley, J., dissenting) (noting the majority "pretend[ed] the respondents made an argument that [was] easier for the majority to dismiss" instead of addressing the parties' actual argument). This dissent details the majority's analytical blunders, which lead the majority to absurdly conclude Catholic Charities are purely secular.

## I.  BACKGROUND

¶116 Every Roman Catholic diocese in Wisconsin has a Catholic Charities entity, which is its social ministry arm. Catholic Charities Bureau, Inc. (CCB) is the Catholic Charities entity for the Diocese of Superior, Wisconsin.  The purpose of CCB "is to be an effective sign of the charity of Christ" by providing services according to an "[e]cumenical orientation," meaning the organization makes no distinction on the basis of race, sex, or religion regarding those served, employed, or who serve on its board.  CCB has separately incorporated sub-entities, four of which are parties in this dispute.  The bishop of the Diocese of Superior oversees CCB's programs and services

---

Justice Brian Hagedorn also dissents, questioning why the majority reads the exemption narrowly in the face of constitutionally protected religious freedom.  If the majority sincerely stands behind its analysis, it should explain where the dissents go astray.  As Justice Antonin Scalia put it,

> When I have been assigned the opinion for the Court in a divided case, nothing gives me as much assurance that I have written it well as the fact that I am able to respond satisfactorily (in my judgment) to all the onslaughts of the dissents or separate concurrences. The dissent or concurrence puts my opinion to the test, providing a direct confrontation of the best arguments on both sides of the disputed points.  It's a cure for laziness, compelling me to make the most of my case.

Antonin Scalia, The Dissenting Opinion, 1994 J. Sup. Ct. Hist. 33, 41 (1994).  Pitifully, the majority does not make the most of its case.  Generally, when a party fails to respond to the legal arguments advanced in a case, the court considers the arguments conceded.  United Coop. v. Frontier FS Coop., 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (citing Schlieper v. DNR, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994)). By refusing to offer a word of rebuttal in response to the dissents, the majority concedes its analysis lacks legal merit.

and is in charge of Catholic Charities. It is uncontested that Catholic Charities are operated for a religious reason.

¶117 In 2016, Catholic Charities asked to withdraw from the Wisconsin unemployment tax system. The Department of Workforce Development (DWD) denied the request. Catholic Charities appealed, and an administrative law judge reversed DWD's decision. The Labor and Industry Review Commission (LIRC) reversed the administrative law judge's decision.

¶118 LIRC determined Catholic Charities are not "operated primarily for religious purposes" under Wis. Stat. § 108.02(15)(h)2. LIRC decided "[t]he activities, not the religious motivation behind them or the organization's founding principles, determine whether an exemption from participation in the unemployment insurance program is warranted." Although "[Catholic Charities'] services may be religiously motivated and manifestations of religious belief," LIRC decided Catholic Charities' activities are not "religious per se." LIRC determined "the provision of help to the poor and disabled" is "essentially secular," and therefore denied Catholic Charities the exemption. The circuit court reversed LIRC's decision. The court of appeals then reversed the circuit court.

¶119 The court of appeals decided Catholic Charities do not operate primarily for religious purposes——holding that Catholic Charities' activities are not sufficiently "viewed as . . . inherently religious." Cath. Charities Bureau, Inc. v. LIRC, 2023 WI App 12, ¶45, 406 Wis. 2d 586, 987 N.W.2d 778. The court of appeals held that to receive the exemption under Wis.

5

Stat. § 108.02(15)(h)2., Catholic Charities must have a religious motivation and engage primarily in activities "religious in nature." Id., ¶34. According to the court of appeals, "a religious motivation does not, by itself, mean that the organization is operated primarily for religious purposes." Id., ¶62. It is "the type of religious activities engaged in by the organization" that determines its eligibility for the exemption. Id., ¶45. The court of appeals acknowledged Catholic Charities have a religious motivation for conducting their charitable activities. Id., ¶¶56-57. Nevertheless, the court of appeals decided Catholic Charities' charitable activities "are neither inherently or primarily religious activities":

> CCB and its sub-entities do not operate to inculcate the Catholic faith; they are not engaged in teaching the Catholic religion, evangelizing, or participating in religious rituals or worship services with the social service participants; they do not require their employees, participants, or board members to be of the Catholic faith; participants are not required to attend any religious training, orientation, or services; their funding comes almost entirely from government contracts or private companies, not from the Diocese of Superior; and they do not disseminate any religious material to participants. Nor do CCB and its sub-entities provide program participants with an "education in the doctrine and discipline of the church."

Id., ¶58 (quoting United States v. Dykema, 666 F.2d 1096, 1100 (7th Cir. 1981)). "While [Catholic Charities'] activities fulfill the Catechism of the Catholic Church to respond in charity to those in need, the activities themselves are not primarily religious in nature." Id., ¶59. The court of appeals

6

held any "spreading of [the] Catholic faith accomplished" by Catholic Charities' activities is only "indirect." Id., ¶61. The court of appeals concluded that although "the Catholic Church's tenet of solidarity compels it to engage in charitable acts, the religious motives of CCB and its sub-entities appear to be incidental to their primarily charitable functions." Id., ¶62.

## II. STATUTORY INTERPRETATION

¶120 The Wisconsin Unemployment Compensation Act provides temporary benefits to eligible unemployed workers. Employers contribute to a government account via a tax. In 1972, the state exempted certain religious nonprofits from paying the tax. See ch. 53, Laws of 1971. Currently, the law says, "'Employment' as applied to work for a nonprofit organization . . . does not include service . . . [i]n the employ of an organization operated primarily for religious purposes and operated, supervised, controlled, or principally supported by a church or convention or association of churches[.]" Wis. Stat. § 108.02(15)(h)2.

¶121 To receive an exemption under Wis. Stat. § 108.02(15)(h)2., a nonprofit must meet two requirements: (1) the organization must be "operated primarily for religious purposes" and (2) the organization must be "operated, supervised, controlled, or principally supported by a church or convention or association of churches[.]"[4] The parties agree

_____

[4] Cf. St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772, 782 n.12 (1981).

7

Catholic Charities are "operated, supervised, controlled, or principally supported by a church." The parties dispute whether Catholic Charities are "operated primarily for religious purposes." An examination of the statute's language unencumbered by the majority's policy agenda shows Catholic Charities are operated for religious purposes and entitled to the exemption.

¶122 The goal of statutory interpretation is to ascertain a law's objective meaning. State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶47, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting Bruno v. Milwaukee Cnty., 2003 WI 28, ¶25, 260 Wis. 2d 633, 660 N.W.2d 656); see Friends of Black River Forest v. Kohler Co., 2022 WI 52, ¶39, 402 Wis. 2d 587, 977 N.W.2d 342 (stating the Kalal framework involves "ascertaining statutory meaning," not what the legislature or "statute 'intended'"). Courts are supposed to focus on the text of the statute to derive "the fair meaning [from] the text itself." Brey v. State Farm Mut. Auto. Ins. Co., 2022 WI 7, ¶11, 400 Wis. 2d 417, 970 N.W.2d 1 (citing Kalal, 271 Wis. 2d 633, ¶¶46, 52); Friends of Black River Forest, 402 Wis. 2d 587, ¶28 n.13 (In a "textually driven analysis . . . the language of the cited statutes drives the inquiry . . . ."). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Kalal, 271 Wis. 2d 633, ¶45 (citations omitted); see also Wis. Stat. § 990.01(1). If a

8

statute's meaning is plain, the interpretive process ends. Kalal, 271 Wis. 2d 633, ¶45 (citations omitted).

¶123 To determine the meaning of a statute, this court consults the text, context, and structure of the statute. Brey, 400 Wis. 2d 417, ¶11 (citing Milwaukee Dist. Council 48 v. Milwaukee Cnty., 2019 WI 24, ¶11, 385 Wis. 2d 748, 924 N.W.2d 153). Canons of construction, dictionaries, and the rules of grammar "serve as 'helpful, neutral guides'" to determine a statute's meaning. James v. Heinrich, 2021 WI 58, ¶23 n.12, 397 Wis. 2d 517, 960 N.W.2d 350 (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 61 (2012)); State v. Sample, 215 Wis. 2d 487, 499, 573 N.W.2d 187 (1998) (first citing Wis. Stat. § 990.01(1); and then citing Swatek v. Cnty. of Dane, 192 Wis. 2d 47, 61, 531 N.W.2d 45 (1995)) ("For purposes of statutory interpretation or construction, the common and approved usage of words may be established by consulting dictionary definitions."); Scalia & Garner, supra, at 140 ("Words are to be given the meaning that proper grammar and usage would assign them."); Neil M. Gorsuch, A Republic, If You Can Keep It 132 (2019) (noting the rules of grammar "play no favorites" in statutory interpretation). Application of the traditional tools of statutory interpretation inexorably leads to the unremarkable conclusion that a nonprofit is "operated primarily for religious purposes" if it is managed primarily for religious reasons. Ascertaining the meaning of the religious exemption's first requirement ("operated primarily

9

for religious purposes") requires a proper understanding of two words——"operated" and "purposes."

### A. Operated

¶124 LIRC argues the word "operated" means "to work, perform, or function." According to LIRC, the word "operate" "connotes" activity. The majority agrees. Majority op., ¶42. Catholic Charities argue the word means "managed" or "used." A textual analysis reveals the word "operated," as used in Wis. Stat. § 108.02(15)(h)2., means "managed." Basic grammar verifies the correctness of this interpretation.

¶125 "Although drafters, like all other writers and speakers, sometimes perpetrate linguistic blunders, they are presumed to be grammatical in their compositions. They are not presumed to be unlettered." Scalia & Garner, supra, at 140 (footnotes omitted). Courts are supposed to prefer interpretations in accord with the rules of grammar over non-grammatical readings. See Indianhead Motors v. Brooks, 2006 WI App 266, ¶9, 297 Wis. 2d 821, 726 N.W.2d 352 (rejecting an interpretation that "defie[d] the rules of grammar"). The word "operated" appears twice in Wis. Stat. § 108.02(15)(h)2. Each

10

time, "operated" is a transitive verb,[5] taking the word "organization" as its direct object. "Operated" should be interpreted in its transitive sense. See State ex rel. DNR v. Wis. Ct. of Appeals, Dist. IV, 2018 WI 25, ¶29, 380 Wis. 2d 354, 909 N.W.2d 114. "Managed" is a common definition of "operated" when used as a transitive verb. E.g., Operate, The Random House Dictionary of the English Language 1009 (1st unabridged ed. 1966) (defining "operate" in the transitive sense as "[t]o manage or use"; "[t]o put or keep . . . working or in operation"; and "[t]o bring about out, effect, or produce, as by action or the exertion of force or influence"). Other textual clues confirm "operated" means "managed."

¶126 The whole text of Wis. Stat. § 108.02(15)(h)2. must be considered when interpreting the word "operated." "Statutory interpretation centers on the 'ascertainment of meaning,' not the recitation of words in isolation." Brey, 400 Wis. 2d 417, ¶13 (citation omitted). "Context is a primary determinant of meaning." Scalia & Garner, supra, at 167; see Clarke v. Wis.

---

[5] In its brief, LIRC insists "operated" is an intransitive verb with no direct object. The majority agrees, citing internet dictionary definitions of "operate" in the intransitive sense. See majority op., ¶42. LIRC and the majority are wrong; "operated" is a transitive verb in Wis. Stat. § 108.02(15)(h)2. It is the "organization"——the direct object——that is "operated"——transitive verb——"primarily for religious purposes" and "operated"——transitive verb——"by a church or convention or association of churches[.]" § 108.02(15)(h)2. Section 108.02(15)(h)2. has a passive construction. See generally Bryan A. Garner, Garner's Modern English Usage 676 (4th ed. 2016). "[O]nly transitive verbs can appear in the passive voice." C. Edward Good, A Grammar Book for You and I . . . Oops, Me! 33 (2002).

11

Elections Comm'n, 2023 WI 79, ¶198, 410 Wis. 2d 1, 998 N.W.2d 370 (Rebecca Grassl Bradley, J., dissenting) (citing Towne v. Eisner, 245 U.S. 418, 425 (1918)). The word "operated" is used twice in § 108.02(15)(h)2.: "operated primarily for religious purposes and operated, supervised, controlled, or principally supported by a church or convention or association of churches[.]" (Emphasis added.) "[A]bsent textual or structural clues to the contrary[,]" we presume a word used multiple times in a statute bears the same meaning throughout. DNR, 380 Wis. 2d 354, ¶30 (citations omitted); DaimlerChrysler v. LIRC, 2007 WI 15, ¶29, 299 Wis. 2d 1, 727 N.W.2d 311 (quoting Harnischfeger Corp. v. LIRC, 196 Wis. 2d 650, 663, 539 N.W.2d 98 (1995)) ("It is a basic rule of construction that we attribute the same definition to a word both times it is used in the same statute or administrative rule."). The text and structure of § 108.02(15)(h)2. confirm the word "operated" bears the same meaning in both uses. Section 108.02(15)(h)2. uses the word "operated" twice within the same sentence, providing strong evidence the word means the same thing in both instances. Miss. ex rel. Hood v. AU Optronics Corp., 571 U.S. 161, 171 (2014) (quoting Brown v. Gardner, 513 U.S. 115, 118 (1994)) ("[T]he 'presumption that a given term is used to mean the same thing throughout a statute' is 'at its most vigorous when a term is repeated within a given sentence.'"). Additionally, the word "operated" is a transitive verb in both uses, sharing the same direct object: "organization." It is not credible that the word "operated," which is used twice in the same sentence,

12

sharing the same direct object, means something different in each use. See United States v. Cooper Corp., 312 U.S. 600, 606 (1941) ("It is hardly credible that Congress used the term 'person' in different senses in the same sentence.").

¶127 In its second appearance in Wis. Stat. § 108.02(15)(h)2., the word "operated" is followed by the verbs "supervised, controlled, [and] principally supported." It is a basic principle of statutory interpretation that the meaning of words should be understood "by reference to their relationship with other associated words or phrases." State v. Popenhagen, 2008 WI 55, ¶46 n.25, 309 Wis. 2d 601, 749 N.W.2d 611. When words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar. The [associated-words canon] especially holds that 'words grouped in a list should be given related meanings.'" Scalia & Garner, supra, at 195 (citing Third Nat'l Bank in Nashville v. Impac Ltd., Inc., 432 U.S. 312, 322 (1977)). "Managed" is a definition of "operated" that works for both uses of the word "operated" in the statute, and "managed" has a related meaning to "supervised, controlled, [and] principally supported." § 108.02(15)(h)2. The majority's proffered interpretation of "operated"——"to work, perform, or function, as a machine does[,]" majority op., ¶42 (quoted source omitted)——is utterly unlike "supervised, controlled, [and] principally supported." § 108.02(15)(h)2. Because "operated" means "managed" in its second appearance, it most likely means "managed" in its first appearance as well.

13

¶128 The text, its context, and the canons of construction all support the conclusion that "operated" means "managed" in Wis. Stat. § 108.02(15)(h)2. The definition of "operated" advanced by LIRC and adopted by the majority simply does not work. Both define "operated" to mean "to work, perform, or function . . . ." Majority op., ¶42 (citations omitted). Both treat "operated" as a synonym for the word "activity"——an interpretation unsupported by the statutory text. Treating "operated" as a stand in for the noun "activity" either assigns "operated" two different senses in the same sentence, or gives "operated" a meaning oddly dissimilar to the words surrounding it in its second use. See § 108.02(15)(h)2. (requiring the nonprofit to be "operated, supervised, controlled, or principally supported by a church or convention or association of churches"). Additionally, defining "operated" to mean "activity" transmogrifies a verb, "operated," into a noun, "activity." The majority's interpretation of "operated" violates the "fundamental rule of textual interpretation . . . that neither a word nor a sentence may be given a meaning that it cannot bear." Scalia & Garner, supra, at 31.

### B. Purposes

¶129 The majority correctly concludes the word "purposes" means the reasons for which something is done. Majority op., ¶43 (quoting Purpose, https://www.dictionary.com/browse/purpose (last visited Feb. 27, 2024)); purpose, The Random House Dictionary of the English Language 1167 (1st unabridged ed.

14

1966) (defining "purpose" as "the reason for which something exists or is done, made, used, etc."); see also Brown Cnty. v. Brown Cnty. Taxpayers Ass'n, 2022 WI 13, ¶38, 400 Wis. 2d 781, 971 N.W.2d 491 (internal quotation marks omitted) (quoting Purpose, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/purpose (last visited Feb. 14, 2022)) (the "common definition" of "purpose" is "the reason why something is done or used" or "the aim or intention of something"). To be "primarily operated for religious purposes," the nonprofit must be managed primarily for a religious reason.

¶130 LIRC resists this common-sense understanding of "purposes," insisting "purposes" means "[t]he employers' business activity, objectives, goals and ends." LIRC argues this court should not consider the reasons why a nonprofit is operated. LIRC cites a legal dictionary——purpose, Black's Law Dictionary 1493 (11th ed. 2019)——for its conclusion that "purposes" means "business activity." Because "purposes" is an ordinary term,[6] however, we should use ordinary dictionaries to

_____

[6] In its brief, LIRC tepidly argues the term "religious purposes" is a term of art in tax law, citing United States v. Dykema, 666 F.2d 1096 (7th Cir. 1981). The majority gestures at (but does not commit to) the same argument, likewise relying on Dykema. Majority op., ¶54. While Dykema deemed "religious purposes" a "term of art in tax law," 666 F.2d at 1101, it did not cite any authority to support its contention; it also failed to explain why it believed the phrase is a term of art. No cases support Dykema's assertion; only two parroted it. The only cases to treat "religious purposes" as a term of art are Dykema, 666 F.2d at 1101, Living Faith, Inc. v. Commissioner, 950 F.2d 365, 376 (7th Cir. 1991), which cited Dykema, and Catholic Charities Bureau, Inc. v. LIRC, 2023 WI App 12, ¶39, 406 Wis. 2d 586, 987 N.W.2d 778, the court of appeals decision in this case, which cited only Dykema. In reaching its conclusion, the Dykema court interpreted 26 U.S.C. § 501(c)(3),

aid our search for its meaning. See Sanders v. State of Wis. Claims Bd., 2023 WI 60, ¶14, 408 Wis. 2d 370, 992 N.W.2d 126 (lead opinion) (internal citations omitted) ("To determine common and approved usage, we consult dictionaries. To determine the meaning of legal terms of art, we consult legal dictionaries."); see majority op., ¶43 (quoted source omitted). Unless a word or phrase is a legal term of art or statutorily defined, words and phrases are given their "common, ordinary, and accepted meaning." Kalal, 271 Wis. 2d 633, ¶45. "Business activity" is anything but the ordinary meaning of "religious purposes." LIRC's assertion that "purposes" means "objectives, goals and ends" does not logically lead to considering only Catholic Charities' activities, much less whether those activities are inherently religious. An objective, goal, or end cannot be divorced from motives. "Purposes" means the reason something is done, the motivation underlying the action. As a matter of simple logic, "purposes" does not mean the action itself.

---

which exempts entities operated exclusively for "religious, charitable, scientific, testing for public safety, literary, or educational purposes." Federal regulations undermine Dykema's characterization of "religious purposes" as a term of art. Regulations define what "charitable," "educational," "testing for public safety," and "scientific" mean. 26 C.F.R. § 1.501(c)(3)-1(d)(2)-(5). Conspicuously absent is any definition of what "religious" means under the statute. Dykema's representation that "religious purposes" is a term of art in tax law is also severely undermined by divergent interpretations of "operated primarily for religious purposes" embraced by state courts. See majority op., ¶38 n.10 (collecting a sample of cases). Neither Dykema, LIRC, nor the majority have provided any basis for construing "religious purposes" as a term of art.

16

C.  Applying the Plain Meaning of Wis. Stat. § 108.02(15)(h)2.

¶131 As a matter of statutory construction, common usage of ordinary terms, and basic grammar, "operated primarily for religious purposes" means managed primarily for religious reasons.  See, e.g., Czigler v. Adm'r, Ohio Bureau of Emp. Servs., 501 N.E.2d 56, 58 (Ohio Ct. App. 1985).  No one disputes that the only reason the Catholic Church operates Catholic Charities is religious.  See majority op., ¶59; see also Cath. Charities Bureau, 406 Wis. 2d 586, ¶47 ("[N]either DWD nor this court dispute that the Catholic Church holds a sincerely held religious belief as its reason for operating CCB and its sub-entities.").  It's no surprise the issue is uncontested—Catholic Charities' raison d'être is religious.  A court must accept a religious entity's good faith representations that religious beliefs motivate an operation and the operation furthers a religious mission.  Holy Trinity Cmty. Sch., Inc. v. Kahl, 82 Wis. 2d 139, 154-55, 262 N.W.2d 210 (1978); See United States v. Lee, 455 U.S. 252, 257 (1982); Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 342 (1987) (Brennan, J., concurring in the judgment) ("Determining that certain activities are in furtherance of an organization's religious mission . . . is . . . a means by which a religious community defines itself."); See also Kendall v. Dir. of Div. of Emp. Sec., 473 N.E.2d 196, 199 (Mass. 1985); Hollis Hills Jewish Ctr. v. Comm'r of Lab., 461 N.Y.S.2d 555, 556 (N.Y. App. Div. 1983) (stating that an employer's statement that its operation

17

furthers a religious objective, "made in good faith, must be accepted by civil courts"). That should end the inquiry, and Catholic Charities should receive the tax exemption. Regardless of whose motivations are relevant——Catholic Charities' or the Diocese of Superior's——Catholic Charities are managed primarily for religious reasons.

### D. Whose Purposes

¶132 Because it is undisputed that the only reason Catholic Charities are operated is religious (no matter whose purposes are relevant under Wis. Stat. § 108.02(15)(h)2.) the majority need not decide whose purposes are relevant. Nevertheless, the majority answers the question, botching the analysis. The answer should be obvious from the statutory text: The purposes of the entity that operates the nonprofit are the relevant purposes under the statute. When trying to figure out why a nonprofit exists, ask the manager, not those managed.

¶133 The majority comes to the opposite conclusion, deeming the nonprofit's subjective motivations relevant. Majority op., ¶34. The majority's rationale is unconvincing. As a preliminary matter, the majority relies on a false dichotomy. The majority asks whether——in all cases——the analysis focuses on the church's motivations or the nonprofit's motivations. See id., ¶33. Not all cases, however, will present those two options. The text of Wis. Stat. § 108.02(15)(h)2. indicates it is the operator's motivations that are relevant. A nonprofit could operate itself. Alternatively, a "church or convention or association of churches" could operate the nonprofit.

18

§ 108.02(15)(h)2. As a third option, a third party could operate the nonprofit. The statute's language contemplates that a nonprofit may be operated by a third party and the exemption will be available if the nonprofit is "operated primarily for religious purposes" and "supervised, controlled, or principally supported by a church or convention or association of churches[.]" § 108.02(15)(h)2.

¶134 With the majority's false dichotomy discredited, the majority's conclusion collapses. There is no surplusage under a textualist reading. When a church operates a nonprofit, focusing on the church's motivations for doing so will not lead to every religiously affiliated organization "automatically" receiving an exemption because "[a] church's purpose is religious by nature." See majority op., ¶37. When a nonprofit is self-operated or operated by a third party other than a church, the "operated primarily for religious purposes" requirement still has force.[7] The "operated primarily for religious purposes" requirement is not "pointless," Scalia & Garner, supra, at 176, if the relevant motives are that of the nonprofit's operator, which could be the nonprofit itself or a third party other than a church. The surplusage canon applies only if an interpretation renders a word or phrase meaningless

---

[7] The majority's surplusage argument is additionally flawed because it relies on the false assumption that a church's purposes are by definition religious. Id., ¶37. While that sounds reasonable, it is not universally true. Nothing precludes a church from taking an action for a nonreligious reason. Similarly, it is not true that a school's motivations are by definition educational.

19

or redundant. See id. That is not the case under a fair reading of Wis. Stat. § 108.02(15)(h)2.

¶135 The majority also argues we should focus on the nonprofit's motivations because the exemption relates to the services of the employees of a nonprofit, not a church. Majority op., ¶34.[8] But whose services are exempt under the statute does not indicate whose purposes are relevant under Wis. Stat. § 108.02(15)(h)2. The majority's conclusion simply doesn't follow from its premises. The majority persists with its fallacious analysis, arguing the nonprofit's motivations are always the relevant motivations because "the phrase 'operated primarily for religious purposes' modifies the word 'organization,' not the word 'church'" in § 108.02(15)(h)2. Id. No one denies it is the nonprofit that must be operated primarily for religious purposes, not the church. But that doesn't mean the nonprofit's motivations control the application of the statute.

¶136 If (as the majority agrees) "purposes" means one's subjective reason for doing something, then in determining why a nonprofit is being operated, it is the operator's motives that matter. According to the majority, however, the court can determine the subjective reason why a nonprofit is operated without examining the motives of the entity operating the

---

[8] The majority similarly argues that "[t]hose employed by a church are . . . addressed in subdivisions 1. and 3. [of Wis. Stat. § 108.02(15)(h)], indicating . . . that 'employees who fall under subd. 2. are to be focused on separately in the statutory scheme from employees of a church.'" Id., ¶35 (quoting Cath. Charities Bureau, 406 Wis. 2d 586, ¶25).

20

nonprofit. The majority's conclusion refutes itself. Apparently the majority would ask a car why it is being operated rather than asking the driver. If the majority's analysis seems ridiculous, that's because it is.

E. The Majority's Test

¶137 The majority affirms LIRC's denial of the exemption under Wis. Stat. § 108.02(15)(h)2. using a two-prong test: A nonprofit must (1) operate primarily for a religious reason and (2) primarily engage in activities that are "religious in nature." Majority op., ¶¶59-67. The majority's test, however, is unmoored from the text of § 108.02(15)(h)2. The majority insists its test is the only way to "give reasonable effect to every word" in the statute because considering purposes alone would "give short shrift to the word 'operated.'" Id., ¶¶44-45. But the majority's reformulation of the text relies on an unreasonable interpretation of § 108.02(15)(h)2., while impermissibly adding words to the statute.

¶138 The majority offends basic rules of grammar by transmuting "operated," a transitive verb, into a noun——"activity." It does not address what "operated" means in its second use in Wis. Stat. § 108.02(15)(h)2.; instead, the majority completely ignores the fact that the word is used twice, employing a divide-and-conquer method of statutory interpretation this court has rebuked many times. E.g., Brey, 400 Wis. 2d 417, ¶13 (citing Kalal, 271 Wis. 2d 633, ¶47); see also Scalia & Garner, supra, at 167; King v. Burwell, 576 U.S. 473, 500-01 (2015) (Scalia, J., dissenting) ("[S]ound

21

interpretation requires paying attention to the whole law, not homing in on isolated words or even isolated sections. Context always matters.").

¶139 The majority completely reimagines the statute. Compare the statute's actual language to the majority's remaking of it:

- Wisconsin Stat. § 108.02(15)(h)2.: "'Employment' as applied to work for a nonprofit organization . . . does not include service . . . [i]n the employ of an organization operated primarily for religious purposes and operated, supervised, controlled, or principally supported by a church or convention or association of churches[.]"

- Majority's interpretation: "'Employment' as applied to work for a nonprofit organization . . . does not include service . . . [i]n the employ of an organization ~~operated~~ that has primarily ~~for~~ religious purposes and primarily performs activities that are religious in nature, which is ~~and~~ operated, supervised, controlled, or principally supported by a church or convention or association of churches[.]"

The majority's interpretation violates the "cardinal maxim . . . that courts should not add words to a statute to give it a certain meaning." State v. Hinkle, 2019 WI 96, ¶24, 389 Wis. 2d 1, 935 N.W.2d 271 (quoting State v. Fitzgerald, 2019 WI 69, ¶30, 387 Wis. 2d 384, 929 N.W.2d 165) (internal quotation marks omitted); State v. Neill, 2020 WI 15, ¶23, 390 Wis. 2d

22

248, 938 N.W.2d 521 (quoting Fond Du Lac Cnty. v. Town of Rosendale, 149 Wis. 2d 326, 334, 440 N.W.2d 818 (Ct. App. 1989)). Instead of reading words into the statute and rearranging the words to meet a desired result, we must "'interpret the words the legislature actually enacted into law.'" Neill, 390 Wis. 2d 248, ¶23 (quoting Fitzgerald, 387 Wis. 2d 384, ¶30).

¶140 Troublingly, the majority's redefinition of "operated" to mean "activities" does not require a nonprofit to primarily engage in activities that are "religious in nature." The majority fails to identify the source of its "religious in nature" requirement; it simply declares it and moves on. The majority also fails to explain where——in the text——the majority derives the factors it uses to deny Catholic Charities the exemption.

¶141 With no support for its interpretation in the text of Wis. Stat. § 108.02(15)(h)2., the majority attempts to "buttress[] [its] conclusion" with this court's decision in Coulee Catholic Schools. Majority op., ¶50. But that decision concerned the ministerial exception under the First Amendment, not the statute at issue in this case. Coulee Cath. Schs. v. LIRC, 2009 WI 88, 320 Wis. 2d 275, 768 N.W.2d 868. Because Coulee Catholic Schools has nothing to say about the meaning of § 108.02(15)(h)2., the case is irrelevant. The majority baldly asserts the decision "'provides guidance in understanding the religious purposes exemption here[,]'" majority op., ¶52 (quoting Cath. Charities Bureau, 406 Wis. 2d 586, ¶43), but

23

fails to explain how Coulee Catholic Schools sheds any light on the meaning of § 108.02(15)(h)2., a statute it never mentions.

¶142 The majority also mistakenly relies upon federal cases interpreting 26 U.S.C. § 501(c)(3), which exempts from taxation "[c]orporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes . . . ." Cases interpreting and applying this exemption do not support the majority's conclusion that an exemption under Wis. Stat. § 108.02(15)(h)2. is available only if (1) a nonprofit's motivations are primarily religious and (2) the actual activities engaged in by the nonprofit are primarily "religious in nature." The majority relies on a case from the Seventh Circuit, United States v. Dykema. But the majority misunderstands Dykema and other federal cases interpreting 26 U.S.C. § 501(c)(3).

¶143 To the extent federal courts evaluate an organization's activities, they do not delve into whether the organization's activities are "religious in nature," as the majority does. Instead, some federal courts use activities as evidence of motive in cases interpreting and applying 26 U.S.C. § 501(c)(3). Dykema is not an exception. As the court in Dykema explained, "it is necessary and proper for the IRS to survey all the activities of the organization, in order to determine whether what the organization in fact does is to carry out a religious mission or to engage in commercial business." 666 F.2d at 1100 (emphasis added).

24

¶144 The Seventh Circuit later verified the limited role an organization's activities might play in the inquiry. As the Seventh Circuit explained in Living Faith v. Commissioner, in evaluating "whether [an organization] is 'operated exclusively' for exempt purposes within the meaning of § 501(c)(3)" "[the court] focus[es] on 'the purposes toward which an organization's activity are directed, and not the nature of the activities." 950 F.2d 365, 370 (7th Cir. 1991) (quoted source omitted). The activities and the "particular manner in which an organization's activities are conducted" are simply "evidence" used to "determin[e] whether an organization has a substantial nonexempt purpose" because "an organization's purposes may be inferred from its manner of operations." Id. at 372; accord Presbyterian & Reformed Publ'g. Co. v. Comm'r, 743 F.2d 148, 156 (3d Cir. 1984) (stating the "inquiry must remain that of determining the purpose to which the . . . activity is directed"); B.S.W. Grp., Inc. v. Comm'r, 70 T.C. 352, 356-57 (1978) (citation omitted) ("[T]he purpose towards which an organization's activities are directed, and not the nature of the activities themselves, is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization exempt from tax under section 501(a)."); Golden Rule Church Ass'n v. Comm'r, 41 T.C. 719, 728 (1964) (first citing Trinidad v. Sagrada Orden, 263 U.S. 578, 582 (1924); and then citing Unity Sch. of Christianity, 4 B.T.A. 61, 70 (1926)) ("The statute requires, in relevant part, that the committee be organized and operated exclusively for religious purposes. In this requirement, the

25

statutory language treats as a touchstone, not the organization's activity, but rather the end for which that activity is undertaken."). Activities serve only as "useful indicia of the organization's purpose or purposes." Living Faith, 950 F.2d at 372.[9] Dykema's list of "[t]ypical activities"[10] in which an organization operated for religious

---

[9] See also 26 C.F.R. § 1.501(c)(3)-1(c)(1) (stating "[a]n organization will be regarded as operated exclusively for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose").

[10] Dykema provided the following list:

(a) corporate worship services, including due administration of sacraments and observance of liturgical rituals, as well as a preaching ministry and evangelical outreach to the unchurched and missionary activity in partibus infidelium; (b) pastoral counseling and comfort to members facing grief, illness, adversity, or spiritual problems; (c) performance by the clergy of customary church ceremonies affecting the lives of individuals, such as baptism, marriage, burial, and the like; (d) a system of nurture of the young and education in the doctrine and discipline of the church, as well as (in the case of mature and well developed churches) theological seminaries for the advanced study and the training of ministers.

Dykema, 666 F.2d at 1100.

It is unclear why the majority relies on Dykema's list as heavily as it does. Dykema did not cite any legal authority supporting its list of typical religious activities. See id. The court simply made it up. Moreover, Dykema's list is not used by other courts. The only published opinions having relied on its list are the court of appeals, below, and this court——in this very case. Moreover, Dykema's list was meant to serve only as a list of "[t]ypical activities" done for a religious purpose. Id. Nothing in Dykema suggests a nonprofit is

26

purposes might engage is just that——a list of <u>typical</u> religious activities. 666 F.2d at 1100. Courts interpreting and applying 26 U.S.C. § 501(c)(3) have acknowledged that religious purposes might be unorthodox or resemble secular purposes. <u>E.g.</u>, <u>Golden Rule Church Ass'n</u>, 41 T.C. 719 (holding a commercial enterprise was operated for religious purposes because it was created as an illustration of the applicability of a church's teachings in daily life); <u>accord</u> <u>Dep't of Emp. v. Champion Bake-N-Serve, Inc.</u>, 592 P.2d 1370 (Idaho 1979) (holding a bakery was "operated primarily for religious purposes" under state law because the students at issue worked at the bakery as a part of their religious training); <u>see</u> <u>Amos</u>, 483 U.S. at 344 (Brennan, J., concurring in the judgment) (noting "[c]hurches often regard the provision of [community services] as a means of fulfilling religious duty and of providing an example of the way of life a church seeks to foster").

¶145 Federal cases interpreting 26 U.S.C. § 501(c)(3) do not support the majority's bifurcated purpose-activities test, under which courts must determine whether an activity is religious or secular in nature. At most, the federal cases support examining an organization's activities as evidence of

"operated primarily for religious purposes" only if the organization engages primarily in activities that are "religious in nature," as the majority requires.

The majority also wrongly asserts that the <u>Dykema</u> court "examined an organization's actual activities." Majority op., ¶87. The <u>Dykema</u> court did no such thing. The court reversed a district court decision denying the enforcement of an IRS summons that called for 14 categories of records belonging to a church. 666 F.2d at 1098, 1104.

27

motive. Because both LIRC and the majority concede that the reason Catholic Charities are operated is religious, federal precedent supplies no support for the majority's faulty conclusion.

¶146 It is unsurprising that no other court has adopted the majority's approach; it is incoherent. The majority's bifurcated purpose-activities test falls apart upon the faintest scrutiny. Most obviously, religious activities cannot be separated from religious purposes. It is the underlying religious motivation that makes an activity religious. See, e.g., Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 715-16 (1981); Univ. of Great Falls v. N.L.R.B., 278 F.3d 1335, 1346 (D.C. Cir. 2002). For example, anyone——religious or irreligious——could use peyote,[11] kill animals,[12] grow a 1/2-inch beard,[13] or use Saturday as a day of rest.[14] One could read the Bible for secular or religious reasons. Cf. Locke v. Davey, 540 U.S. 712, 734-35 (2004) (Thomas, J., dissenting) (explaining that "the study of theology does not necessarily implicate religious devotion or faith" since it may be done "from a secular perspective as well as from a religious one"). One

---

[11] Emp. Div., Dep't of Hum. Res. of Or. v. Smith, 494 U.S. 872 (1990).

[12] Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993).

[13] Holt v. Hobbs, 574 U.S. 352 (2015) (holding a prison's refusal to allow a Muslim to grow a 1/2-inch beard violated the Religious Land Use and Institutionalized Persons Act of 2000).

[14] Sherbert v. Verner, 374 U.S. 398 (1963).

28

could erect a cross to promote a Christian message or honor fallen soldiers. See Am. Legion v. Am. Humanist Ass'n, 588 U.S. ___, 139 S. Ct. 2067, 2082 (2019). Such activities are religious activities only if motivated by religious beliefs. See Holt v. Hobbs, 574 U.S. 352, 360-61 (2015); Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 717 n.28 (2014); Wisconsin v. Yoder, 406 U.S. 205, 216 (1972) ("A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief."). Unable to divorce religious activities from religious motivations, the majority's activities prong swallows the majority's purposes prong. The only activities that are "religious in nature," according to the majority, are activities that presuppose a religious purpose——e.g., proselytizing and teaching one's religious doctrine. Majority op., ¶¶55, 60. The majority's purposes prong is superfluous.

¶147 The majority's activities prong doesn't simply ask whether an activity is religious, it asks whether it is "religious in nature." But no activities are inherently religious; religious motivation makes an activity religious. The majority actually inquires whether Catholic Charities' activities are stereotypically religious. Nothing in the text of Wis. Stat. § 108.02(15)(h)2., however, prompts the court to determine what religious activities are sufficiently stereotypical. The majority never explains what an inherently

29

religious activity is, leaving it up to courts to make determinations of religiosity on an ad hoc basis. What is inherently religious will simply reflect what an individual judge subjectively regards as religious enough. The statute does not demand this exercise, and more importantly the constitution bars such an inquiry. Infra, ¶¶163-97.

¶148 Further highlighting the deficiencies of the majority's test, the majority fails to explain why the factors it furnishes make an activity more or less "religious in nature." For example, why does offering a service to those of a different faith tradition make the activity less "religious in nature"? See majority op., ¶61. Doesn't this factor conflict with the majority's statements that religious outreach and evangelism are "religious in nature"? Id., ¶60. The majority asserts that activities resembling secular ones are less "religious in nature." Id., ¶¶63-64, 66. But the overlap between secular and religious conduct does not make the religious conduct any less religious. As the Court of Appeals for the District of Columbia Circuit explained, "[t]hat a secular university might share some goals and practices with a Catholic or other religious institution cannot render the actions of the latter any less religious." Univ. of Great Falls, 278 F.3d at 1346.

¶149 Incoherency aside, the majority's primarily-religious-in-nature-activities requirement is highly susceptible to manipulation. "[T]he definition of a particular program can always be manipulated" such that the inquiry may be "'reduced to

30

a simple semantic exercise.'" See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 215 (2013) (quoting Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 547 (2001)). The activities of Catholic Charities can be characterized as the provision of charitable social services. They can also be characterized as "providing services to the poor and disadvantaged as an expression of the social ministry of the Catholic Church in the Diocese of Superior" and acting as "an effective sign of the charity of Christ." A religious activity can be described narrowly, making it sound more secular, or described broadly, making it sound more religious. Baking sounds secular while religious training sounds religious; both characterizations could fit the activities at issue in a case. See Champion Bake-N-Serve, Inc., 592 P.2d 1370. Whether one is entitled to the exemption under Wis. Stat. § 108.02(15)(h)2. cannot turn on word games.

¶150 The court makes meager effort to explain why it considers activities like proselytizing and teaching religious doctrine more religious than religiously motivated charitable services. Many religions consider charity a central religious practice. As one amicus——the Jewish Coalition for Religious Liberty ("the Jewish Coalition")——explains, it believes each of the commandments in the Torah is a divine obligation.[15] One of the obligations is charity, which the Jewish Coalition explains

---

[15] Amicus Br. Jewish Coalition for Religious Liberty, at 7.

31

is sometimes connected to religious rituals and sometimes not; regardless, both equally express the Jewish commandments.[16]

¶151 The majority's conclusion that Catholic Charities' activities are not religious because their activities are charitable is unsupportable. In this case, there is no daylight between religious activities and charitable activities. See St. Augustine's Ctr. for Am. Indians, Inc. v. Dep't of Lab., 449 N.E.2d 246, 249 (Ill. Ct. App. 1983) (quoting St. Vincent DePaul Shop v. Garnes, No. 74AP-76, 1974 WL 184313, *3 (Ohio Ct. App. Sept. 17, 1974) (unpublished opinion)) (alterations in original) ("[T]he terms 'charitable' and 'religious' are not mutually exclusive and . . . 'the fact that an organization is charitable does not preclude it from being religious.'"). In their briefs, Catholic Charities explain that charity is a religious activity for Catholics, in which Catholic Charities engages as the Diocese of Superior's social ministry arm. According to Catholic Charities, "[c]harity is 'the greatest' of the Catholic Church's theological virtues . . . . Charity . . . is a 'constitutive element of the Church's mission and an indispensable expression of her very being.'" Consistent with Catholic doctrine——as documented in the briefs——"[t]he Catholic Church 'claims works of charity as its own inalienable duty and right.'" Catholic Charities explains that according to the Catholic faith, charity is a religious duty they must fulfill in an impartial manner, without proselytizing. As Catholic Charities inform us, "'the Church's missionary spirit is not

---

[16] Id. at 7-8.

32

about proselytizing, but the testimony of a life that illuminates the path, which brings hope and love.'"  Catholic Charities "carr[y] on [the Diocese of Superior's] good work by providing programs and services that are based on gospel values and principles of the Catholic Social Teachings."  The purpose of Catholic Charities "is to be an effective sign of the charity of Christ[.]"  Multiple amici similarly confirm that charity is a religious activity in each of their respective faith traditions.  As one court observed, "the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions."  W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C., 862 F. Supp. 538, 544 (D.D.C. 1994).

> For example, one of the five Pillars of Islam——the fundamental ritual requirements of worship, including ritual prayer——requires Muslims of sufficient means to give alms to the poor and other classes of recipients. Also, Hindus belonging to the Brahmin, Ksatriya, and Vaisya castes are required to fulfill five daily obligations of worship, one of which is making offerings to guests, symbolized by giving food to a priest or giving food or aid to the poor.  The concept finds its place in Judaism in the form of tendering to the poor clothing for the naked, food for the hungry, and benevolence to the needy.

Id. (internal citations omitted).  Reflecting this understanding, an Illinois court[17] recently reversed a state agency determination that an organization was not primarily operated for religious purposes, holding the agency "erred by recharacterizing [the provision of meals, homework help, and

---

[17] Illinois courts consider the activities of a nonprofit in cases under the Illinois equivalent of Wis. Stat. § 108.02(15)(h)2.  E.g., Concordia Ass'n v. Ward, 532 N.E.2d 411 (Ill. Ct. App. 1988).

33

literacy improvement] as secular activities" when the organization "characterized [those activities] as religious exercises" of the organization. By The Hand Club for Kids, NFP, Inc. v. Dep't of Emp. Sec., 188 N.E.3d 1196, ¶52 (Ill. Ct. App. 2020). The same is true in this case. Catholic Charities' charitable activities are a part of their religious exercise, which means those activities are religious. This court belittles Catholic Charities' faith——and many other faith traditions——by mischaracterizing their religiously motivated charitable activities as "secular in nature," majority op., ¶67——that is, not really religious at all.

¶152 Ultimately, the majority demolishes its own test, obliquely saying the activities the majority will consider inherently religious "may be different for different faiths." Id., ¶55. If what constitutes an inherently religious activity might be different for different faiths, the majority must explain why religiously motivated charity is not an inherently religious activity for Catholics. It never does.

¶153 The majority's erroneous interpretation and application of Wis. Stat. § 108.02(15)(h)2.——which produces the demeaning conclusion that the social ministry arm of the Diocese of Superior is inherently secular——would be baffling but for the majority's admissions of its results-oriented approach. According to the majority, a plain reading of the statute would be "'too broad'" a policy, so the majority adopts a contorted construction instead. Id., ¶48 (quoting Cath. Charities Bureau, 406 Wis. 2d 586, ¶37). The majority anxiously speculates a

34

plain reading might exempt Catholic colleges, schools, and (gasp) hospitals. Id., ¶48 n.12.[18] This court has neither the authority nor competency to decide how broad or narrow a policy should be. The legislature decided how broadly the exemption sweeps, and it is not for this court to second-guess that policy decision. Friends of Frame Park, U.A. v. City of Waukesha, 2022 WI 57, ¶96, 403 Wis. 2d 1, 976 N.W.2d 263 (Rebecca Grassl Bradley, J., concurring) ("The people of Wisconsin elect judges

_____

[18] The majority's footnote expressing indignation at the prospect that religious colleges, schools, and hospitals might be exempt under Catholic Charities' reading of the exemption appears to prejudge issues not before this court. Amicus curiae, Maranatha Baptist University, et al., comprises a collection of faith-based nonprofits that primarily provide education. Its brief notes that a number of its members currently qualify for the exemption under Wis. Stat. § 108.02(15)(h)2., but would likely lose that exemption if this court upholds the court of appeals. Amicus Br. Maranatha Baptist University, et al., at 5-6. Amicus argues "[t]he federal government has long counted religious schools as being operated primarily for religious purposes." Id. at 9 n.1 (citing Unemployment Insurance Program Letter No. 28-87, U.S. Dept. of Labor (June 10, 1987)) ("'The second category of services exempt from the required coverage are those performed in the employ of religious schools and other entities . . . .'"). The majority simply ignores this argument.

Curiously, the majority's assumption that Catholic colleges and schools cannot qualify for the exemption exists in tension with the cases upon which it relies. The majority analogizes its test to cases applying the ministerial exception under the First Amendment. In each of the cases the majority cites, however, the religious school received the exception. Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. ___, 140 S. Ct. 2049 (2020); Coulee Cath. Schs. v. LIRC, 2009 WI 88, 320 Wis. 2d 275, 768 N.W.2d 868; see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171 (2012). The majority neglects to explain why Catholic colleges and schools receive such radically different treatment under the test it employs in this case.

35

to interpret the law, not make it."); See also Scalia & Garner, supra, at 21; Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 20 (1997) ("Congress can enact foolish statutes as well as wise ones, and it is not for courts to decide which is which and rewrite the former."). "Courts decide what the law is, not what it should be. In the course of executing this judicial function, we neither endorse nor condemn the legislature's policy choices." See Sanders, 408 Wis. 2d 370, ¶44. Judges have no authority to advance their favored policies by expanding or narrowing a statute's text beyond what the fair meaning of the statute contemplates.

¶154 To mask its policy-driven reasoning, the majority employs the shibboleth that remedial statutes are liberally construed and exemptions are narrowly construed——a long-discredited maxim that pawns judicial activism off as legitimate, textual interpretation. See CTS Corp. v. Waldburger, 573 U.S. 1, 12 (2014) (stating the remedial statute canon is not "a substitute for a conclusion grounded in the statute's text and structure"). The majority's unabashed reliance on the remedial statute canon is troubling given the immense criticism the so-called canon has received. The majority makes clear it is aware of these criticisms, but uses the maxim anyway, without defending it. Majority op., ¶47 n.11. The majority should not employ the maxim so thoughtlessly, since it has been severely criticized and abandoned by many jurists espousing a wide range of judicial philosophies. E.g., Regions Bank v. Legal Outsource PA, 936 F.3d 1184, 1195 (11th Cir. 2019)

36

(expressly refusing to apply the so-called remedial statute canon because of its "dubious value"); Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Newport News Shipbuilding & Dry Dock Co., 514 U.S. 122, 135 (1995) (calling the maxim the "last redoubt of losing causes"); Keen v. Helson, 930 F.3d 799, 805 (6th Cir. 2019) (describing the maxim as the least useful of the interpretive tools a judge might use); see also E. Bay Mun. Util. Dist. v. U.S. Dep't of Com., 142 F.3d 479, 484 (D.C. Cir. 1998) ("express[ing] . . . general doubts about the canon"). Antonin Scalia once compared the canon's use to Chinese water torture, in which "one's intelligence [is] strapped down helplessly" as the maxim is repeated as a "ritual error[]." Antonin Scalia, Assorted Canards of Contemporary Legal Analysis, 40 Case W. Rsrv. L. Rev. 581, 581 (1989) [hereinafter Assorted Canards].

¶155 Judges have discarded the remedial statute canon because it has three critical flaws. The first is the canon's "indeterminate coverage." Regions Bank, 936 F.3d at 1195. Jurists have been unable to agree on what constitutes a remedial statute. Scalia, Assorted Canards, supra, at 583-86; Ober United Travel Agency, Inc. v. U.S. Dep't of Lab., 135 F.3d 822, 825 (D.C. Cir. 1998) ("Although courts have often used the maxim[,] . . . it is not at all apparent just what is and what is not remedial legislation."). This is unsurprising, considering "almost every statute might be described as remedial in the sense that all statutes are designed to remedy some problem." CTS Corp., 573 U.S. at 12; accord Scalia & Garner,

supra, at 364 ("Is any statute <u>not</u> remedial? Does any statute <u>not</u> seek to remedy an unjust or inconvenient situation?"); <u>Keen</u>, 930 F. 3d at 805 (noting that the canon's "trigger——a 'remedial statute'——is hopelessly vague").

¶156 Second, what constitutes a "liberal" or "strict" construction is unanswerable. Scalia & Garner, <u>supra</u>, at 365. As Antonin Scalia noted, the canon "lay[s] a judicial thumb" "of indeterminate weight" "on one or the other side of the scales" in statutory interpretation. Scalia, <u>Assorted Canards</u>, <u>supra</u>, at 582. "How 'liberal' is liberal, and how 'strict' is strict?" <u>Id.</u> No one can say.

¶157 Finally, the maxim is "premised on two mistaken ideas: (1) that statutes have a singular purpose and (2) that [the legislature] wants statutes to extend as far as possible in service of that purpose. Instead, statutes have many competing purposes, and [the legislature] balances these competing purposes by negotiating and crafting statutory text." <u>Keen</u>, 930 F.3d at 805 (citing <u>Newport News</u>, 514 U.S. at 135-36); <u>CTS Corp.</u>, 573 U.S. at 12 (quoting <u>Rodriguez v. United States</u>, 480 U.S. 522, 525-26 (1987) (per curiam)) ("[T]he Court has emphasized that 'no legislation pursues its purposes at all costs.'"); <u>Encino Motorcars, LLC v. Navarro</u>, 584 U.S. ___, 138 S. Ct. 1134, 1142 (2018) (citations omitted). As Richard Posner explained, the maxim is "unrealistic about legislative objectives" and "ignore[s] the role of compromise in the legislative process and, more fundamentally, the role of interest groups, whose clashes blunt the thrust of many

38

legislative initiatives." Richard A. Posner, Statutory Interpretation——in the Classroom and in the Courtroom, 50 U. Chi. L. Rev. 800, 808-09 (1983). The maxim ignores that "limiting provisions . . . are no less a reflection of the genuine 'purpose' of the statute than the operative provisions, and it is not the court's function to alter the legislative compromise." Scalia & Garner, supra, at 21. Those who employ the maxim rarely appreciate that "[t]oo much 'liberality' will undermine the statute as surely as too literal an interpretation would." In re Erickson, 815 F.2d 1090, 1094 (7th Cir. 1987).

¶158 In fact, the remedial statute "canon" is not a canon at all. It is "an excuse" to reach a desired result. Keen, 930 F.3d at 805; Scalia, Assorted Canards, supra, at 586 (stating the maxim "is so wonderfully indeterminate" it can always be used to "reach[] the result the court wishes to achieve"). Its vagueness makes it "an open invitation" to ignore the statute's text and "engage in judicial improvisation" to reach the judge's preferred outcome. Scalia & Garner, supra, at 365-66. This court should abandon the maxim and return to deciding cases based upon the fair meaning of the text. Instead of reading the exemption strictly, "the court need only determine 'how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued.'" United Am., LLC v. DOT, 2021 WI 44, ¶44, 397 Wis. 2d 42, 959 N.W.2d 317 (Rebecca Grassl Bradley, J., dissenting) (quoting Scalia & Garner, supra, at 33). The majority violates the rule that a "strict construction" cannot be "an unreasonable construction."

Sw. Airlines Co. v. DOR, 2021 WI 54, ¶25, 397 Wis. 2d 431, 960 N.W.2d 384 (citing Covenant Healthcare Sys., Inc. v. City of Wauwatosa, 2011 WI 80, ¶32, 336 Wis. 2d 522, 800 N.W.2d 906); see also McNeil v. Hansen, 2007 WI 56, ¶10, 300 Wis. 2d 358, 731 N.W.2d 273 (quoting 82 C.J.S. Statutes § 371 (2006)) (stating exemptions to remedial statutes "'should be strictly, and reasonably, construed and extend only as far as their language fairly warrants'"). To the extent the maxim delivers any value, it is not even applicable in this case because the statute is unambiguous. State of Wis. Dep't of Just. v. DWD, 2015 WI 114, ¶32, 365 Wis. 2d 694, 875 N.W.2d 545 (quoting Salazar v. Ramah Navajo Chapter, 567 U.S. 182, 207 (2012) (Roberts, J., dissenting)).

¶159 The majority compounds its errors by using legislative history to contradict (rather than confirm) the plain meaning of Wis. Stat. § 108.02(15)(h)2. Kalal, 271 Wis. 2d 633, ¶51; State v. Martin, 162 Wis. 2d 883, 897 n.5, 470 N.W.2d 900 (1991). Legislative history is not the law, and it cannot override the law's clear meaning. See State v. Grandberry, 2018 WI 29, ¶55, 380 Wis. 2d 541, 910 N.W.2d 214 (Kelly, J., concurring) ("[W]e give effect only to what the legislature does, not what it tried to do."). In this case, the majority does not even cite state legislative history; instead, it relies upon federal legislative history to contravene the plain meaning of a state law. In so doing, the majority makes another "law's history superior to the law itself[.]" Clean Wis., Inc. v. DNR, 2021 WI 71, ¶91, 398 Wis. 2d 386, 961 N.W.2d 346 (Rebecca Grassl Bradley, J.,

40

dissenting). Using long-discredited methodologies, the majority's interpretation discards the statutory text, ignores its plain meaning, and triggers constitutional quandaries.

### III. THE MAJORITY'S INTERPRETATION VIOLATES THE FIRST AMENDMENT AND THE WISCONSIN CONSTITUTION

¶160 The majority's decision is an egregious example of legislating from the bench. It takes a simple statute and twists its language to narrow its sweep. In so doing, the majority engages in religious discrimination and entangles the state with religion in violation of the First Amendment.[19] Courts sometimes——though inappropriately——warp a statute's fair meaning to save it from unconstitutionality. See St. Augustine Sch. v. Taylor, 2021 WI 70, ¶112, 398 Wis. 2d 92, 961 N.W.2d 635 (Rebecca Grassl Bradley, J., dissenting) (discussing a particularly egregious example). In this case, the majority bends over backwards to alter the statute's meaning and create a constitutional violation, turning the canon of constitutional avoidance on its head. State v. Stenklyft, 2005 WI 71, ¶8, 281 Wis. 2d 484, 697 N.W.2d 769 (quoting Panzer v. Doyle, 2004 WI 52, ¶65, 271 Wis. 2d 295, 680 N.W.2d 666); Jankowski v. Milwaukee Cnty., 104 Wis. 2d 431, 439, 312 N.W.2d 45 (1981) (quoting Niagara of Wis. Paper Corp. v. DNR, 84 Wis. 2d 32, 50,

---

[19] Any constitutional issues arising from a plain-meaning interpretation of Wis. Stat. § 108.02(15)(h)2. are not before the court. Similarly, the constitutionality of the second prong of § 108.02(15)(h)2., requiring the nonprofit to be "operated, supervised, controlled, or principally supported by a church or convention or association of churches[,]" is not before the court. See, e.g., Christian Sch. Ass'n of Greater Harrisburg v. Commonwealth, Dep't of Lab. & Indus., 423 A.2d 1340, 1346-47 (Pa. 1980).

41

268 N.W.2d 153 (1978)); Baird v. La Follette, 72 Wis. 2d 1, 5, 239 N.W.2d 536 (1976) ("Where there is serious doubt of constitutionality, we must look to see whether there is a construction of the statute which is reasonably possible which will avoid the constitutional question.").

¶161 The First Amendment declares: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. The Religion Clauses of the First Amendment apply to the states via the Fourteenth Amendment. Everson v. Bd. of Educ. of Ewing Twp., 330 U.S. 1, 15 (1947); Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).[20] Catholic Charities claim an inquiry into

---

[20] Justice Clarence Thomas of the United States Supreme Court has questioned whether the Establishment Clause properly applies to states. Zelman v. Simmons-Harris, 536 U.S. 639, 678-79 (2002) (Thomas, J., concurring); Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 45, 49-51 (2004) (Thomas, J., concurring in the judgment); Van Orden v. Perry, 545 U.S. 677, 692-93 (2005) (Thomas, J., concurring); Town of Greece v. Galloway, 572 U.S. 565, 604-07 (2014) (Thomas, J., concurring in part and concurring in the judgment); Am. Legion v. Am. Humanist Ass'n, 588 U.S. ___, 139 S. Ct. 2067, 2095 (2019) (Thomas, J., concurring in the judgment); Espinoza v. Mont. Dep't of Revenue, 591 U.S. ___, 140 S. Ct. 2246, 2263-64 (2020) (Thomas, J., concurring). Justice Thomas has argued the Establishment Clause is a "federalism provision," Newdow, 542 U.S. at 45 (Thomas, J., concurring in the judgment), which merely prohibits Congress "from establishing a national religion" and "interfer[ing] with state establishments." Id. at 50. It does "not protect any individual right." Id. Under this theory, the Establishment Clause, "resists incorporation." Id. at 45. "[A]n incorporated Establishment Clause would prohibit exactly what the text of the Clause seeks to protect: state establishments of religion." Am. Legion, 139 S. Ct. at 2095 (Thomas, J., concurring in the judgment) (citation omitted). Scholars have debated whether the Establishment Clause was meant to be incorporated through the Fourteenth Amendment. Compare Vincent Philip Muñoz, The Original Meaning of the Establishment Clause and the

whether their activities are "religious in nature" violates the First Amendment by discriminating against their religious practices and excessively entangling the government in religious affairs.

¶162 The majority improperly stacks the deck against Catholic Charities' claims under the Religion Clauses from the outset, requiring Catholic Charities to prove their First Amendment rights are violated "beyond a reasonable doubt." Majority op., ¶77. "The United States Supreme Court has abandoned the beyond-a-reasonable-doubt standard for assessing the constitutionality of statutory law[,]" and this court must follow the Court's pronouncements on issues of federal law. Winnebago Cnty. v. C.S., 2020 WI 33, ¶65, 391 Wis. 2d 35, 940 N.W.2d 875 (Rebecca Grassl Bradley, J., dissenting) (citing Edward C. Dawson, Adjusting the Presumption of Constitutionality Based on Margin of Statutory Passage, 16 U. Pa. J. Const. L. 97, 109 (2013)). "No United States Supreme Court case since 1984

_____

Impossibility of Its Incorporation, 8 J. Const. L. 585 (2006), and William K. Lietzau, Rediscovering the Establishment Clause: Federalism and the Rollback of Incorporation, 39 DePaul L. Rev. 1191 (1990), with Kurt T. Lash, The Second Adoption of the Establishment Clause: The Rise of the Nonestablishment Principle, 27 Ariz. State L.J. 1085 (1995), and Nathan S. Chapman & Michael W. McConnell, Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience 75-84 (2023). Regardless, the Court has held the Establishment Clause applies to the states, and we are duty bound to apply the Court's decisions interpreting and applying the Establishment Clause. State v. Jennings, 2002 WI 44, ¶¶18-19, 252 Wis. 2d 228, 647 N.W.2d 142; cf. Hutto v. Davis, 454 U.S. 370, 374 (1982) (per curiam) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.").

43

has applied a strong presumption of constitutionality in challenges to federal statutes." Mayo v. Wis. Injured Patients & Fams. Comp. Fund, 2018 WI 78, ¶78, 383 Wis. 2d 1, 914 N.W.2d 678 (Rebecca Grassl Bradley, J., concurring) (citing Dawson, supra, at 109 n.43). Instead, the Court "will strike down statutes upon a 'plain showing' of their unconstitutionality, or when their unconstitutionality is 'clearly demonstrated.'" Id., ¶80. "This court continues to reflexively apply the rule without any acknowledgement of the United States Supreme Court's reformulation of the standard." Id. (citations omitted). Conforming to the standards articulated by the Court would end the absurdity of applying the beyond-a-reasonable-doubt standard. The majority does not hold Catholic Charities' First Amendment rights are not violated by its interpretation of Wis. Stat. § 108.02(15)(h)2.; instead, it merely holds Catholic Charities failed to prove their rights are violated "beyond a reasonable doubt." See C.S., 391 Wis. 2d 35, ¶67 (Rebecca Grassl Bradley, J., dissenting).

A. Religious Discrimination

¶163 The majority's interpretation of Wis. Stat. § 108.02(15)(h)2. violates the First Amendment's Free Exercise Clause and Establishment Clause by discriminating among religious faiths. The majority sidesteps the issue of religious discrimination by declaring Catholic Charities failed to show the law burdens their free exercise of religion. Majority op., ¶¶105-07. The majority, however, misapprehends Catholic Charities' alleged burden, causing it to erroneously conclude

44

there is no burden on their free exercise at all. Contrary to the majority's assertions, Catholic Charities do not allege that paying the tax itself burdens their free exercise of religion. See Id.[21] Catholic Charities never argued the Free Exercise Clause guarantees them an exemption from paying the unemployment tax. Instead, Catholic Charities assert that discriminatorily denying them the exemption under § 108.02(15)(h)2. burdens their free exercise of religion.

¶164 Catholic Charities are correct.[22] The United States Supreme Court has long held that withholding a benefit or privilege based on religious status or activity may constitute a burden on the free exercise of religion. Sherbert v. Verner, 374 U.S. 398, 404 (1963); Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. 449, 466 (2017) (holding expressly requiring a religious institution to renounce its religious character in order to receive a public benefit imposes a penalty

---

[21] The majority exclusively relies upon cases in which the litigant argued the Free Exercise Clause required the state to provide an exemption from a generally applicable tax. Majority op., ¶105 (first citing Jimmy Swaggart Ministries v. Bd. of Equalization of Cal., 493 U.S. 378, 391 (1990); and then citing Hernandez v. Comm'r, 490 U.S. 680, 699-700 (1989)); see also United States v. Lee, 455 U.S. 252 (1982) (rejecting that the Free Exercise Clause requires an exemption from paying social security taxes even if the payment of such taxes violates one's sincerely held religious beliefs).

[22] The Free Exercise Clause would not, absent Wis. Stat. § 108.02(15)(h)2., require the state to exempt Catholic Charities from paying the tax. After it creates a religious exemption, however, the state cannot discriminate against certain religions or religious practices in applying the exemption. See Carson v. Makin, 596 U.S. 767, 785 (2022); Golden Rule Church Ass'n v. Comm'r, 41 T.C. 719, 729 (1964).

45

on the free exercise of religion); Espinoza v. Mont. Dep't of Revenue, 591 U.S. ___, 140 S. Ct. 2246, 2260 (2020) (quoted source omitted) (noting "precedents have 'repeatedly confirmed' the straightforward rule that . . . [w]hen otherwise eligible recipients are disqualified from a public benefit 'solely because of their religious character,' we must apply strict scrutiny"); Carson v. Makin, 596 U.S. 767, 786-88 (2022) (holding religious status or activity cannot be the basis for denying a benefit or privilege); Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 449 (1988). As the Supreme Court said long ago, "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." Sherbert, 374 U.S. at 404 (citations omitted).

¶165 Supreme Court precedent has focused on the denial of a "generally available" benefit to those with a religious status or who engage in certain religious activities. Carson, 596 U.S. at 780. For example, in Sherbert, an employer fired a member of the Seventh-day Adventist Church because she would not work on Saturdays, and the state later denied her otherwise generally available unemployment benefits because it determined her religious beliefs were not "good cause" to reject other employment. 374 U.S. at 400. The Supreme Court held that denying her unemployment benefits because of her religious practices placed a burden on her free exercise of religion:

> Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling

46

forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

Id. at 404. As the court concluded, "to condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." Id. at 406.[23]

¶166 In Trinity Lutheran, a state offered grants to nonprofits to help finance the purchase of rubber playground surfaces. 582 U.S. at 454. The program awarded grants based on several religiously neutral criteria, such as the level of poverty in the surrounding area and the applicant's plan to promote recycling. Id. at 455. However, the state denied Trinity Lutheran Church Child Learning Center a grant it was otherwise qualified to receive because of the state's policy to deny grants to any applicant owned or controlled by a church, sect, or religious entity. Id. at 455-56. The Court held that denying Trinity Lutheran the otherwise available grant burdened

---

[23] See also Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707 (1981) (holding that failure to provide a Jehovah's Witness unemployment benefits because he quit his job due to his religious objections to making armaments burdened his free exercise); Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136 (1987) (holding that failure to provide a member of the Seventh-day Adventist Church unemployment benefits because she was fired after refusing to work from sundown on Friday to sundown on Saturday in accordance with her religious beliefs burdened her free exercise of religion).

Trinity Lutheran's free exercise of religion. The Court reasoned a denial based on religion penalizes religious exercise:

> [T]he Department's policy puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution. Of course, Trinity Lutheran is free to continue operating as a church . . . . But that freedom comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the Center is otherwise fully qualified. And when the State conditions a benefit in this way, . . . the State has punished the free exercise of religion: "To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties."

Id. at 462 (some alterations in original) (quoting McDaniel v. Paty, 435 U.S. 618, 626 (1978) (plurality opinion)). The Court acknowledged the state's policy did not constitute direct coercion over religious exercise. Id. at 463. But withholding an otherwise available benefit based on religious status creates constitutionally intolerable indirect coercion over, and a penalty on, religious exercise. Id. (quoting Lyng, 485 U.S. at 450) ("[T]he Free Exercise Clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'").

¶167 In Carson, a state provided tuition assistance to parents who lived in school districts that were unable to operate a secondary school. 596 U.S. at 773. Under the program, parents chose the school they wanted their child to attend and the state school administrative units paid the school. Id. at 773-74. In order for a private school to

48

receive the payment, the school needed to meet basic requirements under the state compulsory education law, like offering a course on the history of the state. Id. at 774. State law excluded "sectarian" schools from the tuition reimbursement program. Id. The petitioners wished to send their children to schools that were, but for the "nonsectarian" requirement, eligible to receive the tuition assistance. Id. at 776.

¶168 The Court held the program's "nonsectarian" requirement violated the Free Exercise Clause because the law "'effectively penalize[d] the free exercise' of religion" by conditioning the tuition assistance on the school's religious character. Id. at 780. The state argued that lesser scrutiny should apply because it was not discriminating against religious status, but withheld state funds if the school engaged in certain religious activities. Id. at 786-87. The Court rejected the status-activities distinction, noting that "[a]ny attempt to give effect to such a distinction by scrutinizing whether and how a religious school pursues its educational mission would . . . raise serious concerns about state entanglement with religion and denominational favoritism." Id. at 787 (citations omitted).

¶169 The exemption in this case is available only to religiously affiliated institutions. See Wis. Stat. § 108.02(15)(h)2. (requiring the nonprofit to be "operated, supervised, controlled, or principally supported by a church or convention or association of churches" in order to receive the

49

tax exemption). Nonetheless, the principles underlying Sherbert, Trinity Lutheran, and Carson have equal force when the alleged discrimination occurs among religious institutions, rather than between religious and secular entities.

¶170 The Sherbert-Trinity Lutheran-Carson line of cases prohibit indirect coercion and penalties on religious exercise. E.g., Carson, 596 U.S. at 778 (quoting Lyng, 485 U.S. at 450); Thomas, 450 U.S. at 717-18 ("Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists."). Failure to provide a benefit, which is otherwise available to any religiously affiliated entity, to a religious institution because of its religious status or religious activities "condition[s] the availability of [a] benefit[] upon [its] willingness to violate a cardinal principle of [its] religious faith[,] effectively penaliz[ing] the free exercise of [its] constitutional liberties." Sherbert, 374 U.S. at 406. Even if a benefit is available only to religiously affiliated organizations, the denial of the benefit still pressures the entity to forego its religious practices, forcing the entity to "choose between following the precepts of [its] religion and forfeiting benefits." Id. at 404. As in Sherbert, Trinity Lutheran, and Carson, such a choice burdens the free exercise of religion.

50

¶171 At their core, the Religion Clauses prohibit the government from discriminating among religions. "From the beginning, this nation's conception of religious liberty included, at a minimum, the equal treatment of all religious faiths without discrimination or preference." Colo. Christian Univ. v. Weaver, 534 F.3d 1245, 1257 (10th Cir. 2008). Historically, England privileged the Church of England and penalized non-established religions and practices. In the 16th century, Parliament enacted the Thirty-nine Articles of Faith, which determined the tenets of the Church of England and the liturgy for religious worship. Nathan S. Chapman & Michael W. McConnell, Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience 12-13 (2023). Additionally, "[t]he Acts of Uniformity of 1549, 1559, and 1662 required all ministers to conform to these requirements, making the Church of England the sole institution for lawful public worship." Id. at 13. "There were also specific 'Penal Acts' suppressing the practice of faiths whose tenets were thought to be inimical to the regime." Id. at 14. The practice of establishing churches "of the old world [was] transplanted and . . . thrive[d] in the soil of the new America." Everson, 330 U.S. at 9. In the American colonies religious dissenters were often penalized for their heterodox religious practices. For example, in Connecticut in the 1740s, religious dissenters were fined and imprisoned for preaching and meeting. Philip Hamburger, Separation of Church and State 90 (2002). In Virginia, laws "fin[ed] 'scismaticall persons' who

51

refused to have their children baptized, prohibit[ed] the immigration of Quakers, and outlaw[ed] Quaker religious assemblies." Chapman & McConnell, supra, at 17.

¶172 "During the Revolution, American establishments lost their severity," and states tended to abandon direct penalties on non-established religions and religious practices while retaining privileges for the established religion and religious practices of the state. Hamburger, supra, at 89-90. By the time the First Amendment was written, "at least ten of the twelve state constitutional free exercise provisions required equal religious treatment and prohibited denominational preferences." Colo. Christian Univ., 534 F.3d at 1257 (citing Arlin M. Adams & Charles J. Emmerich, A Heritage of Religious Liberty, 137 U. Pa. L. Rev. 1559, 1637–39 (1989)). One of the "essential legal elements of disestablishment" in the states was denominational equality. Chapman & McConnell, supra, at 57. The principle that the government cannot prefer one religion over another has "strong historical roots and is often considered one of the most fundamental guarantees of religious freedom." Jeremy Patrick-Justice, Strict Scrutiny for Denominational Preferences: Larson in Retrospect, 8 N.Y.C. L. Rev. 53, 54-55 (2005). The constitutional bar on religious discrimination among faiths emanates from both Religion Clauses. Larson v. Valente, 456 U.S. 228, 245 (1982); Colo. Christian Univ., 534 F.3d at 1257.

¶173 The Supreme Court has unwaveringly affirmed the central principle that government cannot prefer one religion

52

over another: "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson 456 U.S. at 244; Everson, 330 U.S. at 15 (stating that under the Establishment Clause, a state cannot "pass laws which . . . prefer one religion over another."); Cutter v. Wilkinson, 544 U.S. 709, 720 (2005) (stating religious exemptions must be "administered neutrally among different faiths"); Zorach v. Clauson, 343 U.S. 306, 314 (1952) ("The government must be neutral when it comes to competition between sects."); Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 707 (1994) ("[I]t is clear that neutrality as among religions must be honored."); Epperson v. Arkansas, 393 U.S. 97, 103-04 (1968) ("Government in our democracy . . . must be neutral in matters of religious theory, doctrine, and practice. It may not . . . aid, foster, or promote one religion or religious theory against another . . . ."); see also Dunn v. Ray, 139 S. Ct. 661, 662 (2019) (Kagan, J., dissenting from grant of application to vacate stay) (describing denominational neutrality as "the Establishment Clause's core principle"). "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532 (1993) (citations omitted); Emp. Div., Dep't of Hum. Res. of Or. v. Smith, 494 U.S. 872, 877 (1990). State laws and practices "which happen to have a

53

'disparate impact' upon different religious organizations" resulting from secular criteria do not amount to a denominational preference or religious discrimination, but laws that do not merely incidentally discriminate against certain religions or religious practices receive strict scrutiny. Larson, 456 U.S. at 246 n.23; Smith, 494 U.S. at 878; Colo. Christian Univ., 534 F.3d at 1257.

¶174 The majority's primarily-religious-in-nature-activities test necessarily and explicitly discriminates among certain religious faiths and religious practices. As the majority construes Wis. Stat. § 108.02(15)(h)2., religious institutions that do not perform sufficiently religious acts to satisfy the court's subjective conceptions of religiosity will be denied the exemption. The government cannot "discriminate between 'types of institutions' on the basis of the nature of the religious practice these institutions are moved to engage in." Colo. Christian Univ., 534 F.3d at 1259.

¶175 While the application of secular criteria that leads to disparate treatment of religions is not religious discrimination, the relevant criteria under the majority's test are not secular. The majority denies the exemption to institutions if they do not primarily engage in activities the court deems "religious in nature"——a criterion that can only be described as religious. See Church of Lukumi, 508 U.S. at 533 ("A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context."). It includes only a small, and ill-defined,

54

subset of religious activities. The majority employs factors that are similarly not secular. For example, the majority asks whether a nonprofit engages in worship services, religious ceremonies, serves only co-religionists, or imbues program participants with the nonprofit's faith. Such criteria certainly sound religious, not secular.

¶176 The majority declares Catholic Charities ineligible for the exemption because Catholic Charities do not participate in worship services, engage in religious outreach, perform religious ceremonies, provide religious education, "imbue program participants with the Catholic faith[,] []or supply any religious materials to program participants or employees." Majority op., ¶60. Additionally, the majority denies the exemption on the non-secular and discriminatory basis that Catholic Charities employ and serve non-Catholics. Id., ¶61. In the majority's view, Catholic Charities' religious practices resemble secular social services too much. Id., ¶¶63-64, 66. The majority's "test" compares the nonprofit's activities to an arbitrary list of stereotypical religious activities to determine whether the activities are sufficiently religious. Id., ¶100 (explaining that activities like those listed in Dykema are more likely to be "religious in nature" in the eyes of the court).

¶177 The majority's test overtly discriminates against Catholic Charities because they follow Catholic doctrine. As Catholic Charities explain, Catholic doctrine commands they engage in charity without limiting their assistance to fellow

55

Catholics and bars them from proselytizing when conducting charitable acts. Under the Free Exercise Clause, the state cannot condition a benefit upon the abandonment of religious practices. The majority puts Catholic Charities to a choice: They may receive the tax exemption by violating their religious beliefs or they can conduct their operations in accordance with their faith and forgo the exemption. Conditioning a benefit in this manner burdens the free exercise of religion. Trinity Lutheran, 582 U.S. at 462.

¶178 The majority's primarily-religious-in-nature-activities test poses a particular danger for minority faiths. The majority's conception of what constitutes activities that are "religious in nature" reflects a narrow view of what religious practice looks like. Many amici submitted briefs to this court explaining how a test like the majority's will discriminate against minority faiths.

¶179 The brief of the International Society for Krishna Consciousness and the Sikh Coalition ("the Coalition") is particularly illuminating. It notes that government officials are less likely to be familiar with minority faith traditions, and therefore may perceive minority religious practices as less "religious in nature" than the activities of majority religions.[24] The Coalition identifies many activities central to their faiths but likely to fail the majority's test, which compares a nonprofit's activities to a list of stereotypical

---

[24] Amicus Br. International Society for Krishna Consciousness and the Sikh Coalition, at 11.

56

(and largely Protestant) religious activities, because the list is derived from a "Western" understanding of religion.[25] For example, adherents of Hare Krishna have a religious practice called "Prasadam," during which adherents prepare food, offer it to their deity, and distribute it to the general population.[26] Sikhs have a religious practice of providing a community kitchen, "serving free meals and allowing people of all faiths to break bread together."[27] According to the Coalition, this practice is "foundation[al] to the Sikh way of life; it represents the principle of equality among all people regardless of religion . . . ."[28] The Coalition rightly worries that these religious practices will be characterized by courts as "secular in nature" under the majority's test.

¶180 State actors cannot treat one faith's religious practices as "religious in nature" and another's practices as "secular in nature." Cf. Fowler v. Rhode Island, 345 U.S. 67, 70 (1953) ("To call the words which one minister speaks to his congregation a sermon, immune from regulation, and the words of another minister an address, subject to regulation, is merely an indirect way of preferring one religion over another."). The United States Supreme Court subjects such overt religious discrimination to strict scrutiny. See, e.g., Espinoza, 140 S.

---

[25] Id. at 11-13.

[26] Id. at 12-13.

[27] Id. at 13.

[28] Id.

57

Ct. at 2278 (Gorsuch, J., concurring) (stating "any discrimination against religious exercise must meet the demands of strict scrutiny"). A government policy satisfies strict scrutiny only if it "advances 'interests of the highest order' and is narrowly tailored to achieve those interests." Fulton v. City of Philadelphia, 593 U.S. 522, 541 (2021) (quoting Church of Lukumi, 508 U.S. at 546). "That standard 'is not watered down'; it 'really means what it says.'" Tandon v. Newsom, 593 U.S. 61, 65 (2021) (per curiam) (quoting Church of Lukumi, 508 U.S. at 546). As scholars have noted, however, "'[i]t is difficult to imagine the circumstances under which the government would have a compelling need to prefer some religions over others." Richard F. Duncan, The Clearest Command of the Establishment Clause: Denominational Preferences, Religious Liberty, and Public Scholarships that Classify Religions, 55 S.D. L. Rev. 390, 392 (2010) (alteration in original) (quoting Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure 14 (3d ed. 1999)); see also Church of Lukumi, 508 U.S. at 578-80 (Blackmun, J., concurring in the judgment) (arguing a law that discriminates against religion automatically fails strict scrutiny because such a law in not narrowly tailored "by definition").

¶181 LIRC does not even suggest the state has a compelling interest in denying the exemption under Wis. Stat. § 108.02(15)(h)2. in a manner that discriminates among the various faiths. LIRC, like the majority, misunderstands Catholic Charities' asserted burden on the free exercise of

58

their religion. LIRC believes the asserted burden is paying a tax. In response to this misconception of Catholic Charities' claim, LIRC asserts the whole of Wis. Stat. ch. 108 is justified by the compelling interest in "providing broad unemployment insurance access to workers . . . ." LIRC then argues the law is narrowly tailored because "it is impossible to construct workable tax laws that account for the 'myriad of religious beliefs.'" LIRC's arguments miss the mark. Under strict scrutiny, LIRC needed to provide a compelling interest justifying the discrimination between religions. See Fulton, 593 U.S. at 541; Colo. Christian Univ., 534 F.3d at 1269. LIRC failed to do so. This court cannot invent justifications for the state to save the statute from unconstitutionality. See Colo. Christian Univ., 534 F.3d at 1268 ("We cannot and will not uphold a statute that abridges an enumerated constitutional right on the basis of a factitious governmental interest . . . ."); Redeemed Christian Church of God (Victory Temple) Bowie v. Prince George's Cnty., 17 F.4th 497, 510-11 (4th Cir. 2021) (citation omitted) ("To survive strict scrutiny review, the government must show that pursuit of its compelling interest was the actual reason for its challenged action."); Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 543 n.8 (2022) (quoting United States v. Virginia, 518 U.S. 515, 533 (1996)) (noting "'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented post hoc in response to litigation'"). In the absence of any compelling interest to justify the state's discrimination among religions,

59

§ 108.02(15)(h)2., as interpreted by the majority, cannot survive strict scrutiny.

¶182 This case illustrates the interconnection between the right to free exercise and the Constitution's bar on religious establishments. Citizens are inhibited from freely practicing their faiths when the government doles out benefits or imposes penalties on the basis of religious practice. As Justice Neil Gorsuch explained:

> The First Amendment protects religious uses and actions for good reason. What point is it to tell a person that he is free to be Muslim but he may be subject to discrimination for doing what his religion commands, attending Friday prayers, living his daily life in harmony with the teaching of his faith, and educating his children in its ways? What does it mean to tell an Orthodox Jew that she may have her religion but may be targeted for observing her religious calendar? Often, governments lack effective ways to control what lies in a person's heart or mind. But they can bring to bear enormous power over what people say and do. The right to be religious without the right to do religious things would hardly amount to a right at all.

Espinoza, 140 S. Ct. at 2277 (Gorsuch, J., concurring). The "free competition between religions" protected by the Establishment Clause requires "that every denomination . . . be equally at liberty to exercise and propagate its beliefs. But such equality would be impossible in an atmosphere of official denominational preference." Larson, 456 U.S. at 245. The Religion Clauses "make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary" by "sponsor[ing] an attitude on the part of government that shows no partiality to any one group and that lets each flourish

60

according to the zeal of its adherents and the appeal of its dogma." Zorach, 343 U.S. at 313. "Free exercise thus can be guaranteed only when legislators——and voters——are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations." Larson, 456 U.S. at 245.

¶183 While the Free Exercise Clause does not require the state to provide a tax exemption to religious nonprofits, "[w]hat benefits the government decides to give, whether meager or munificent, it must give without discrimination against religious conduct." Espinoza, 140 S. Ct. at 2277 (Gorsuch, J., concurring). In our constitutional order, there are no second-class religions or religious practices. The Religion Clauses bar discrimination against religious status, beliefs, and practices: "Eliminating [religious] discrimination means eliminating all of it." See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 206 (2023). The majority errs by inventing and operationalizing a test that discriminates against Catholic Charities' religious practices——and those of many faith traditions going forward.

¶184 The protection against religious preferences embodied in the First Amendment is even more explicit in the Wisconsin Constitution, which bars the state from giving "any preference . . . by law to any religious establishments or modes of worship."[29] Wis. Const. art. I, § 18; Coulee Cath. Schs., 320

---

[29] Article I, section 18 of the Wisconsin Constitution provides in full:

61

Wis. 2d 275, ¶60 (explaining the Wisconsin Constitution "provid[es] expansive protections for religious liberty" beyond what the First Amendment provides). As this court proclaimed in Weiss, Article I, section 18 of the Wisconsin Constitution, sometimes called the No Preference Clause,[30] "probably furnished a more complete bar to any preference for, or discrimination against, any religious sect, organization, or society than any other state in the Union." State ex rel. Weiss v. Dist. Bd. of Sch. Dist. No. 8 of City of Edgerton, 76 Wis. 177, 208, 44 N.W. 967 (1890) (Cassoday, J., concurring).[31]

¶185 The majority's interpretation of Wis. Stat. § 108.02(15)(h)2. blatantly violates the No Preference Clause. In Weiss, this court explained that the phrase "modes of worship" is capacious, embracing "any and every mode of worshiping the Almighty God." Id. at 211-12. It includes

> The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

[30] King v. Vill. of Waunakee, 185 Wis. 2d 25, 61, 517 N.W.2d 671 (1994) (Heffernan, C.J., dissenting).

[31] While the discussion appears in the concurring opinion of Justice Cassoday, it was on a subject expressly reserved for his consideration, which makes it the opinion of the court. State ex rel. Reynolds v. Nusbaum, 17 Wis. 2d 148, 165 n.3, 115 N.W.2d 761 (1962).

"'the performance of all those external acts, and the observance of those rites and ceremonies, in which men engage with the professed and sole view of honoring God.'" Id. at 212 (listing additional dictionary definitions). Because the statute, under the majority's interpretation, provides benefits for religiously affiliated nonprofits that engage in activities the court deems "religious in nature," it prefers some modes of worship over others. Catholic Charities explained that charitable works are a form of worship for Catholics, who may not proselytize while engaged in acts of charity. The majority denies the exemption to Catholic Charities because they did not engage in other modes of worship, like proselytizing. The majority's test prefers some types of worship (e.g., proselytizing) over others (e.g., religiously motivated charity).

¶186 Instead of addressing the Wisconsin Constitution's impact on this case, the majority dodges the issue, dismissing it in a footnote as "undeveloped." Majority op., ¶3 n.4. But that is not true. The Wisconsin Legislature, as amicus curiae, thoroughly explains in its brief why a test like the one employed by the majority violates the No Preference Clause. That clause "operate[s] as a perpetual bar to the state . . . giving . . . any preference by law to any religious sect or mode of worship." Weiss, 76 Wis. at 210-11. The majority's

63

preference for some religious practices over others violates the Wisconsin Constitution.[32]

### B. Religious Entanglement

¶187 The Establishment Clause provides, "Congress shall make no law respecting an establishment of religion," U.S. Const. amend. I, and "prohibits the excessive entanglement of the state in religious matters." St. Augustine Sch., 398 Wis. 2d 92, ¶42 (citing L.L.N. v. Clauder, 209 Wis. 2d 674, 686, 563 N.W.2d 434 (1997)). The Establishment Clause precludes the state from making "intrusive judgments regarding contested questions of religious belief or practice." Colo. Christian Univ., 534 F.3d. at 1261. "[T]he Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion . . . and any attempt by government to dictate or even to influence such matters . . . constitute[s] one of the central attributes of an establishment of religion." Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. ___, 140 S. Ct. 2049, 2060 (2020) (internal citations and quotations marks omitted).

¶188 Civil courts may answer only factual and legal questions; they lack any authority or competency to answer theological questions. Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440,

---

[32] Because the majority dodges the religious discrimination issues presented by its test, litigants likely will bring such claims in the future, forcing the majority to admit its error. "This decision might as well be written on the dissolving paper sold in magic shops." Fulton v. City of Philadelphia, 593 U.S. 522, 551 (2021) (Alito, J., concurring in the judgment).

445-47, 449-50 (1969). As James Madison explained in his Memorial and Remonstrance, the idea that a "Civil Magistrate is a competent Judge of Religious truth . . . is an arrogant pretension" that has been "falsified" by history. James Madison, Memorial and Remonstrance Against Religious Assessments, reproduced in Everson, 330 U.S. at 67 (appendix to dissent of Rutledge, J.). The majority's opinion proves Madison's thesis. The majority's interpretation of Wis. Stat. § 108.02(15)(h)2. not only encourages excessive entanglement with religion, it compels such entanglement.

¶189 The majority's requirement that a nonprofit's activities be primarily "religious in nature" forces courts to answer debatable theological questions courts have no authority to answer. The majority's test requires courts to decide what activities are sufficiently religious to qualify as "religious in nature." The First Amendment bars the government from ranking activities on a scale from least to most religious. See Thomas, 450 U.S. at 714 ("The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task . . . . However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."). "Courts are not arbiters of scriptural interpretation," and this court cannot choose which religiously motivated actions are, in their essence, religious. Id. at 716. A court cannot decide

65

whether an organization primarily conducts activities that are "religious in nature" without violating the First Amendment.

¶190 Determining whether an organization's activities are primarily "religious in nature" will lead to examining the activities performed by nonprofits, which will be forced to prove whether their religiously motivated activities are sufficiently religious. "What makes the application of a religious-secular distinction difficult is that the character of an activity is not self-evident. As a result, determining whether an activity is religious or secular requires a searching case-by-case analysis. This results in considerable ongoing government entanglement in religious affairs." Amos, 483 U.S. at 343 (Brennan, J., concurring in the judgment); Espinosa v. Rusk, 634 F.2d 477, 481 (10th Cir. 1980), aff'd, 456 U.S. 951 (1982).

¶191 For example, religious schools will be forced to defend the religious nature of textbooks, class instruction, examinations, fieldtrips, employees, students, parents, and more. "[T]his sort of detailed inquiry into the subtle implications of in-class examinations and other teaching activities would itself constitute a significant encroachment on the protections of the First and Fourteenth Amendments." New York v. Cathedral Acad., 434 U.S. 125, 132 (1977). "The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment . . . ." Id. at 133; accord Presbyterian Church

in U.S., 393 U.S. at 449 ("First Amendment values are plainly jeopardized when . . . litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice."). The intrusive inquiries the majority's test demands may recur. While a court initially may deem a nonprofit's activities primarily "religious in nature," the nonprofit may later lose its exempt status. See Walz v. Tax Comm'n, 397 U.S. 664, 673 (1970) ("Qualification for tax exemption is not perpetual or immutable[.]"). The majority gives the state license to monitor whether nonprofits fail to hit the proper ratio of activities that are "religious in nature" to "secular in nature." "'[P]ervasive monitoring' for 'the subtle or overt presence of religious matter' is a central danger against which [the Court has] held the Establishment Clause guards." See Hernandez v. Comm'r, 490 U.S. 680, 694 (1989) (citations omitted). To force religious entities to repeatedly satisfy the state that their activities are "religious in nature" is anathema to the First Amendment.

¶192 The majority's primarily-religious-in-nature-activities test puts state officials and courts in the constitutionally tenuous position of second-guessing the religious significance and character of a nonprofit's actions. Catholic Charities strenuously maintain their charitable activities are religious and central to their faith. Nevertheless, this court rejects Catholic Charities' understanding of the religious significance of their own activities, insisting those activities are actually "secular in

67

nature."  The First Amendment forbids such second-guessing and recharacterization of Catholic Charities' activities.  Lyng, 485 U.S. at 457-58 ("[T]he dissent's approach would require us to rule that some religious adherents misunderstand their own religious beliefs.  We think such an approach cannot be squared with the Constitution or with our precedents, and that it would cast the Judiciary in a role that we were never intended to play."); Thomas, 450 U.S. at 716 ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith.").

¶193 The entanglement occasioned by the impermissible second-guessing of sincere religious claims is compounded by the majority's claim that what constitutes an activity that is "religious in nature" "may be different for different faiths." Majority op., ¶55.  The majority has already made clear it will not take nonprofits at their word that their activities are "religious in nature."  For what constitutes an activity that is "religious in nature" to change from religion to religion, the court must study the doctrines of the various faiths and decide for itself what religious practices are actually religious.  The Constitution bars civil courts from such intrusions into spiritual affairs.  Jones v. Wolf, 443 U.S. 595, 602 (1979) (stating civil courts are barred from "resolving . . . disputes on the basis of religious doctrine and practice").  "Plainly, the First Amendment forbids civil courts from" "determin[ing] matters at the very core of a religion——the interpretation of

68

particular church doctrines and the importance of those doctrines to the religion." Presbyterian Church in U.S., 393 U.S. at 450. The majority opinion strikes at the heart of religious autonomy.

¶194 The majority denies Catholic Charities the exemption under Wis. Stat. § 108.02(15)(h)2. in part because they employ and serve those of other religions. This is not a lawful criterion. Courts are not allowed to determine who is and is not a co-religionist. "[W]ho or what is Catholic . . . is an inquiry that the government cannot make." Holy Trinity, 82 Wis. 2d at 150-51. Deciding who is and is not a co-religionist is plagued with entanglement problems. Are those no longer practicing a faith co-religionists? Our Lady, 140 S. Ct. at 2069. Who decides? "Would the test depend on whether the person in question no longer considered himself or herself to be a member of a particular faith? Or would the test turn on whether the faith tradition in question still regarded the person as a member in some sense?" Id. "What characteristics, professions of faith, or doctrinal tenets render a [person] part of a particular denomination? The statute doesn't tell us, and it would be unconstitutional for any state actor, including a court, to resolve the question." St. Augustine Sch., 398 Wis. 2d 92, ¶138 (Rebecca Grassl Bradley, J., dissenting). Who constitutes a co-religionist is a religious, not legal, question. Colo. Christian Univ., 534 F.3d at 1264-65 (noting such a question "requires [the state] to wade into issues of religious contention").

69

¶195 Whether a nonprofit engages in religious education or "imbue[s] program participants with the Catholic faith" presents additional entanglement problems. Majority op., ¶60. The court must decide what constitutes religious education and evangelism——religious questions whose answers will vary from faith to faith. Does conducting charity as an illustration of the love of one's deity count? What about engaging in a commercial enterprise to illustrate one's faith applied to daily life? See Golden Rule Church Ass'n, 41 T.C. 719. "What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act" educates others about his faith and acts as a form of proselytizing or evangelism? See Smith, 494 U.S. at 887. Whether activities are "'[religious education]' or mere 'education' depends as much on the observer's point of view as on any objective evaluation of the educational activity." Colo. Christian Univ., 534 F.2d. at 1263. "The First Amendment does not permit government officials to sit as judges of the 'indoctrination' quotient" of a nonprofit. Id. Similar problems abound with the majority's declaration that activities involving worship services and religious ceremonies are more "religious in nature." See Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 633-34 (2d Cir. 2020) ("The government must normally refrain from making assumptions about what religious worship requires."). The majority's criteria invite the state and courts to make religious determinations and second-guess the sincere assertions of religiosity of those operating nonprofits.

70

¶196 The majority does not deny its inquiry entangles church and state, but simply asserts that the entanglement occasioned by its misreading of Wis. Stat. § 108.02(15)(h)2. is "inherent in any statutory scheme that offers tax exemption to religious entities"[33]——a preposterous claim in light of the majority's failure to properly interpret the statute, which simply requires the nonprofit's motivations be religious.[34] The majority believes its consideration of whether a nonprofit primarily performs activities "religious in nature" does not unduly entangle government and religion because its inquiry is a "neutral and secular inquiry based on objective criteria." Majority op., ¶86. But there is nothing neutral, secular, or objective about the majority's test for whether activities are "religious in nature." The majority's test asks whether the activities are similar——in some undefined and arbitrary way——to stereotypical religious activities listed in a Seventh Circuit decision, which made the list up from whole cloth. See id., ¶100 (stating that "if one of the religiously motivated sub-entities in this case partook in activities such as those cited by the Dykema court as indicative of a religious purpose" the court would be more likely to decide it is operated primarily

---

[33] Majority op., ¶86.

[34] The majority claims that without an examination of a nonprofit's activities, it wouldn't be possible for a nonprofit to qualify for a tax exemption premised on a "religious purposes" requirement. See id., ¶93 (citing Ecclesiastical Order of Ism of Am, Inc. v. Chasin, 653 F. Supp. 1200, 1205 (E.D. Mich. 1986)). Of course, the court could simply accept Catholic Charities' sincere claims that they operate for religious purposes.

71

for religious purposes).  The test does not "rel[y] exclusively on objective, well-established concepts of . . . law familiar to lawyers and judges."  Jones, 443 U.S. at 603.  Instead, it relies upon each justice's subjective sense of what is genuinely religious and what is not.

¶197 While the majority does not ask "whether [Catholic Charities] are 'Catholic' enough to qualify for the exemption," majority op., ¶85, the majority improperly entangles itself with religion by asking whether Catholic Charities' concededly religious activities are sufficiently religious.  The majority's protestation that its decision doesn't "intrude on questions of religious dogma"[35] is dystopian——"a manner of Orwellian newspeak by which 'religious' means something other than 'religious.'" St. Augustine Sch., 398 Wis. 2d 92, ¶141 (Rebecca Grassl Bradley, J., dissenting).  The majority doesn't simply answer "'delicate' questions," majority op., ¶87, it treads where the Constitution forbids the judiciary from intruding.

### IV.  CONCLUSION

¶198 The majority's decision constitutes a profound overreach of the judicial power.  The majority radically transforms Wis. Stat. § 108.02(15)(h)2., which provides a tax exemption for nonprofits managed primarily for a religious reason "and operated, supervised, controlled, or principally supported by a church or convention or association of churches[.]"  Finding the exemption too broad as a matter of policy, the majority excludes nonprofits it deems insufficiently

---

[35] Id., ¶87.

religious. As newly interpreted, the statute violates the First Amendment and the Wisconsin Constitution. The majority's primarily-religious-in-nature-activities test embodies an unlawful preference for some religious practices and thereby discriminates against others. The test also requires courts to answer theological questions well beyond the judiciary's purview. The majority exercises the power of the legislature, rewriting § 108.02(15)(h)2., and proclaims itself the arbiter of what is and is not religious. Whatever authority the majority believes it possesses to assume these roles is not found in the Wisconsin Constitution. I respectfully dissent.

¶199 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER joins ¶¶110-61 and ¶¶163-98 of this dissent.

73

¶200 BRIAN HAGEDORN, J. *(dissenting)*. Although I would not reach the constitutional questions and do not sign onto every point in the analysis, I agree with the construction of the statute in Justice Rebecca Grassl Bradley's thoughtful dissent. I also agree with the excellent discussion of the majority's misplaced reliance on the remedial statute canon. Justice Rebecca Grassl Bradley's dissent, ¶¶154-58. There is no particular reason to assume a statutory exemption in an area like religious freedom——a constitutionally protected category to which the law regularly gives wide latitude——should be construed narrowly. I respectfully dissent.